Leslie TAYLOR and Kevin Taylor, minors, by Wilbert Taylor and Hallie Taylor, their parents and next friends,

and

Marjorie Williams and Rosylyn Williams, minors, by Rudolph Williams and Marjorie Williams, their parents and next friends,

and

Cheryl Ann Williams, a minor, by Ula Williams, her mother and next, friend,

and

Lynn Garland, a minor, by Thomas Garland, her father and next friend,

and

Benjamin Hall, Lonnie Hall, Michelle Hall and Velma Hall, minors, by Barbara Hall, their mother and next friend,

and

Marilene Murphy, a minor, by Walter Murphy and Willene Murphy, her parents and next friends,

and

for these and all others similarly situated and who may become parties to this action, Plaintiffs,

v.

BOARD OF EDUCATION OF CITY SCHOOL DISTRICT OF CITY OF NEW ROCHELLE,

and

Herbert C. Clish, as Superintendent of Schools of the City School District of the City of New Rochelle, Defendants.

United States District Court
S. D. New York.
Jan. 24, 1961.

Thomas L. Roberts and Paul Zuber, New York City, by Paul Zuber, New York City, of counsel, for plaintiffs.

Murray C. Fuerst, New Rochelle, N. Y., School Counsel, by Julius Weiss, New York City, of counsel, for defendants.

National Lawyers Guild, New York City, amicus curiæ.

National Association for the Advancement of the Colored People, New Rochelle Branch, amicus curiæ.

IRVING R. KAUFMAN, District Judge.

Plaintiffs in this class action, proceeding through their parents, are eleven Negro infants who were formerly enrolled in the Lincoln School, a public elementary school operated by the defendants, the Board of Education of the City of New Rochelle, and Dr. Herbert C. Clish, that city's Superintendent of Schools.[1] It is admitted by the defendant that approximately 94% of the pupils at Lincoln are Negroes. Plaintiffs contend that the Board has deliberately and intentionally created and maintained Lincoln School as a racially segregated school, and thus has violated the Fourteenth Amendment and the principles enunciated in Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.

The Board operates the elementary school system in New Rochelle by means of the neighborhood school plan. Under this plan, as it functions in New Rochelle, the city is divided into twelve districts, each of which is served by a centrally located school. Pupils residing within a particular district are required to attend the school within that district, and permission to transfer to other schools is granted by the school authorities only in exceptional circumstances. Thus, as a result of this policy, the plaintiffs have been compelled to attend the Lincoln School. At the start of the 1960 school term, they sought to register in other elementary schools in the city having a more heterogeneous racial composition; permission to so register was uniformly denied, and this action then followed. During the pendency of this action, plain-

1. Hereinafter, any reference to the defendant will be to the Board of Education, since it is the party primarily involved in this litigation.

tiffs have withdrawn from the Lincoln School, and are receiving private tutoring.

In the fall of 1959, after much public agitation against the racial imbalance in the Lincoln School, the Board proposed to replace the present Lincoln School building, admittedly antiquated, with a modern facility on the same site to serve the same neighborhood.[2] Financing for this proposal was approved in a referendum held on May 24, 1960. The plaintiffs view this decision by the Board as the culmination of a course of conduct designed to maintain Lincoln as a racially segregated school. They thus seek an injunction restraining the defendant from proceeding with the construction of the new school. They also seek to enjoin the Board from refusing to allow them to register in schools other than Lincoln which are not racially segregated, and from requiring them to register in the Lincoln School.

The defendant Board vigorously contends that the charge of racial segregation is absurd. Its position is that no child is compelled to attend any school in the City of New Rochelle solely on the basis of race or color. It points out that two-thirds of the Negro elementary school children in New Rochelle attend public schools other than Lincoln, and that the city's two junior high schools and one senior high school are attended by all children regardless of race. It urges that the high proportion of Negroes in the Lincoln School is a result solely of residential patterns, rather than any desire on its part to maintain Lincoln as a segregated school. With respect to its decision to rebuild Lincoln School, the Board contends that it was made only after an exhaustive study undertaken in good faith, which led it to conclude that the course chosen was the only feasible alternative. Thus, the defendant maintains that no constitutional rights of the plaintiffs have been infringed in any way.

 After hearing and observing the witnesses, and carefully examining the large amount of documentary evidence submitted, I conclude that the defendant's conduct has violated the Constitution, denying the plaintiffs the right to the equal protection of the laws guaranteed by the Fourteenth Amendment. I find (1) that the Board of Education of New Rochelle, prior to 1949, intentionally created Lincoln School as a racially segregated school, and has not, since then, acted in good faith to implement desegregation as required by the Fourteenth Amendment;[3] and (2) that the conduct of the Board of Education even since 1949 has been motivated by the purposeful desire of maintaining the Lincoln School as a racially segregated school.[4]

2. Although Lincoln School presently has a maximum capacity of 622 and an enrollment of 483 children, the proposed new school will accommodate only 400. Thus, almost 100 children will be dispersed, presumably to neighboring schools, after construction of the new building is completed.

3. It should be noted that under Section 2502 of the New York State Education Law, McKinney's Consol.Laws, c. 16, the Board of Education is a corporate body, and as such bears a continuous responsibility for the operation of the New Rochelle public schools. This responsibility is not terminated or altered by the inevitable turnover in individual membership, which has occurred from 1930 to date. Otherwise, illegal conduct of a public body could rarely be challenged. Thus, the conduct of the Board, is, in law, viewed similarly to the conduct of any corporation; individual changes in membership have no legal significance in the context of this case. In addition, nothing in this opinion criticizing conduct of the Board of Education is meant to apply to those members who have urged that the present course of conduct in relation to the Lincoln School be altered.

4. The plaintiffs also contended that the quality of education afforded at the Lincoln School was inferior and that the educational achievement of the Negro children at Lincoln had thus been curtailed. Much evidence as to teacher qualifications, teacher turnover, and various student test scores was introduced by both sides in this connection. But, in the view which I take of the case, it is not necessary to consider these claims. Brown v. Board of Education, supra,

█ I am mindful of the recent admonition of Mr. Justice Frankfurter, in Gomillion v. Lightfoot, 81 S.Ct. 125, 128, as to the dangers of an undiscerning application of broad generalizations in a delicate area such as this, when important rights of individuals are so directly affected. Justice Frankfurter re-emphasized what should always have been obvious: that it is the particular facts in each case which are determinative, and thus that it is incumbent upon the court to examine these facts with scrupulous care. He said:

"Particularly in dealing with claims under broad provisions of the Constitution, which derive content by an interpretive process of inclusion and exclusion, it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts."

In light of this admonition, before discussing what I conceive to be the controlling principles of law applicable to this case, and the legal import of the respective contentions raised by the parties, I will fully elaborate the facts which have impelled me to the conclusion that defendant's conduct has violated the Constitution.

### The Facts

In order to comprehend the Lincoln problem, as it has evolved, familiarity with the geographic and racial character of the city of New Rochelle is necessary. The city has an elongated shape, its length from north to south being almost four times its average width. The settling of population started in the southern half of the town; in relatively recent years the northern end of the city has developed. That area, however, is now in the midst of a housing boom, and in the past ten years two new elementary schools—Ward and Davis—have been built to accommodate north end students. There are virtually no Negroes in this area. The north central part of town is served by two schools, Roosevelt in the west and Barnard in the east, with only the latter having a sizeable Negro enrollment. The southern end of the city is also predominantly white in population and is served by two elementary schools—Trinity and Jefferson—which have 5% and 7% Negro enrollment respectively. If a line were drawn east to west across the middle of New Rochelle, the area of predominantly Negro population would be found immediately south of that line, in the south central portion of the city. The Lincoln School District lies in the center of this Negro area. Bordering Lincoln are five other elementary school districts—Mayflower, Stevenson, Washington, Columbus and Webster—all of which contain a substantial Negro population. Washington school has a Negro enrollment of greater than 50%, while the Negro enrollment of the other four schools varies from approximately 17% to approximately 30%.

Lincoln School was built in 1898; there is no evidence as to the Negro population, if any, at that time. Marylynn G. Pierce, a member of the Board of Education, testified that there has been a tradition of a Negro school in New Rochelle for approximately one hundred years, but she did not indicate how this tradition had been inherited by the Lincoln School. Events occurring subsequent to 1930 indicate that by that time the majority of the Negro population of the city was being served by the Lincoln School. In 1930, according to the uncontradicted testimony of Bertha O. White, corroborated in part by the testimony of Mrs. Pierce, and also by official school maps, a policy of gerrymandering was instituted which led to the confining of Negroes within the Lincoln School district by redrawing the district lines to coincide with Negro population movements. (See e. g. Record, pages 131–134, 236–237.) The testimony as to the gerrymandering revealed the following:

(1) In 1930, the Webster School was built, to the northwest of Lincoln, and

has determined that segregated schools established and maintained by official acts are inherently unequal as a matter of law.

thus district lines in the area were redrawn. The boundary lines between Webster and Lincoln were so drawn that, in one section, they were extended to a point directly across the street from the Lincoln School. By this arrangement, an irregular corridor, which was of white population, was carved out from Lincoln and placed in the Webster district. The result was that an area containing white students, directly adjoining the Lincoln School, was districted into the Webster School, despite the fact that this area was far closer to the Lincoln School than to Webster. It was testified that the purpose of this gerrymandering was to confine Negro pupils within the Lincoln district, while allowing whites living in the same area to attend a school which was not predominantly Negro in composition.

(2) In the ensuing years, as the Negro population increased, expanding westward from the Lincoln district, the borders of Lincoln were extended in this direction so as to contain the Negroes within them.

(3) During the same period in which the boundaries between Webster and Lincoln were being adjusted, other alterations were being made between the Lincoln district and the Mayflower district to the north, although these changes were never noted in Board minutes, nor were they reflected on official school maps for many years. By means of these boundary changes, children living in a predominantly white area known as Rochelle Park, then located in the northeast corner of the Lincoln District, were assigned to the Mayflower School.

It is highly significant that the Board has offered no evidence to refute the testimony indicating that this gerrymandering took place. Nor, did it proffer any explanation for this conduct to negate the obvious inference of a desire to segregate. In addition, Board minutes for the period subsequent to 1930 indicate that Lincoln was considered in the community as the Negro School, and that the Board intended it to be utilized after school hours as a meeting place for the Negro community. (See Joint Exhibit VII supplemented by defendants; see also Superintendent's Report, February 2, 1937, submitted on consent of the parties.)

In addition to this gerrymandering, the Board instituted further policies to assure that the Lincoln School District would remain Negro, and to relieve white children of the burden of attending a predominantly Negro school. Thus, up until 1949, white children remaining in the Lincoln district were allowed to transfer to other elementary schools. For example, in the year 1949, Board minutes indicate that 106 children residing in the Lincoln district were allowed by the Board to attend other schools. (Defendants' Exhibit SS.) The Board admitted, in a resolution of November 30, 1959, that

"There was a time when the transfer of children to schools outside the school district of their residence was permitted and this operated unfairly in the Lincoln School district from which white parents were allowed to transfer their children, resulting in a high percentage of Negro children in Lincoln School." (Defendants' Exhibit I.)

This policy produced the anomaly, testified to by Mrs. White, of children living in adjoining houses attending different schools solely on the basis of their race. (Record, pages 141–142.) Further, it appears, for example, that white children living south of the Lincoln School were assigned to Mayflower School, approximately half a mile north of Lincoln. Thus, they apparently had to pass Lincoln each day on their way to school. (See Plaintiffs' Exhibit 6.) The inevitable result of this transfer policy, when combined with the earlier gerrymandering, was that by January of 1949, Lincoln had become a 100% Negro school. (See e. g., Plaintiffs' Exhibit 24.)

The defendant's failure to rebut this evidence of gerrymandering and racially motivated transfers gains even greater significance from the fact that Mr. Sim

Joe Smith, Assistant Superintendent of Schools in New Rochelle since 1930, was present in the courtroom throughout the trial. It was testified that Mr. Smith approved transfers made during this period. When called to the stand by plaintiffs' attorney, Mr. Smith's testimony as to the operation of the transfer policy was vague and evasive, and evinced a conveniently faulty memory.

In examining the Board's conduct subsequent to 1949, it must be remembered that this conduct must be viewed against its historical background and context. It must be examined and evaluated in its totality. Intent, purpose and motivation, while unclear or uncertain if only isolated acts are considered, become defined and recognizable when a total course of conduct is carefully scrutinized.

By 1949, the segregated condition at Lincoln had come to public attention, and numerous civic groups exerted pressure on the Board to alleviate it. As a result of this agitation, the Board passed a resolution, on January 11, 1949, ending the policy of transferring white children out of the Lincoln School and indicating that readjustment of district lines would be considered.[5] At that time, however, the Board did not redistrict in any way, nor has it done so until the present day. Thus, it has done nothing to eliminate the effects of the gerrymandering undertaken previously. Rather, it has chosen to maintain the status quo, imposing, in effect, a freeze on the artificially created boundaries of the Lincoln district. When it determined to maintain the status quo, the Board could hardly have been unaware that this would necessarily perpetuate Lincoln as a predominantly Negro school. For example, on June 17, 1949, a letter written to the Board by Kenneth B. Low, then President of the Council for Unity of New Rochelle (and later a member of the Board), was reprinted in the New Rochelle Standard Star. Low wrote:

"* * * by the redistricting which was made at the time Webster School was built in 1930 the board participated in creating an overbalance of Negro pupils in Lincoln School which steadily increased with the development of the neighborhood until, by virtue of the board's transfer policy, it became an all-Negro school.

"To now enforce district lines, without changing the present Lincoln School district, is to create a situation in which the white pupils will be in a small minority and * * * this appears to be completely unrealistic and undesirable. In our opinion it will result not only in bitter opposition by the parents of the white children in the district but eventually in the removal of these parents from the district and a consequent accentuation of the all-Negro character of the neighborhood and school.

"* * * [S]ound educational policy calls for the integration of children of all races, creeds and national backgrounds in the public schools, which are the cradle of democracy * * * to permit the separation of Negro children from white children throughout their primary school education is indefensible in this community.

* * * * * *

"Any plan which will not freeze Lincoln School as an overwhelmingly Negro school would, in our opinion, be preferable to the present plan of

---

5. The resolution provided as follows:
"Resolved, That the Board of Education study present district lines with a view to setting up school districts in terms of the best interests of all the children and of the most complete utilization of the present physical plant; and be it further

"Resolved, That as of September 1, 1949 district lines as set by the Board will be strictly adhered to according to best educational practices; and be it further

"Resolved, That effective at once all new entrants to the school system be admitted only to the school of the district in which they legally reside."

action which we feel certain will seriously increase the tensions in this area.

\* \* \* \* \* \*

"The board has seemingly overlooked the basic issue of the existence of an all-Negro school in New Rochelle. Similar conditions have been changed in other communities either by closing the Negro school or by redistricting to create a proper balance of white and Negro pupils." (Plaintiffs' Exhibit 23.)

But no action on the part of the Board was forthcoming. The Board has steadfastly refused to alter the rigid neighborhood school policy with the result that the Lincoln School has continued to be a predominantly Negro school. Today, it contains approximately 94% Negroes.

The years between 1949 and 1960 have been eleven years of agitation for New Rochelle. For eleven years, responsible civic-minded organizations and groups have urged that something be done to correct the Lincoln situation; for eleven years the Board has discussed the problem, hired experts, made surveys, and constantly reiterated its belief in racial equality and the necessity for equal opportunities. But, in these eleven years, it has taken no action whatsoever to alter the racial imbalance in the Lincoln School. It has met the problem with mere words, barren of meaning, for they were never followed by deeds.

In 1954, the Supreme Court rendered its opinion in Brown v. Board of Education, supra. This decision heralded a new epoch in the quest for equality of the individual. It called for responsible public officials throughout the country to reappraise their thinking and policies, and to make every effort to afford Negroes the more meaningful equality guaranteed to them by the Constitution. The Brown decision, in short, was a lesson in democracy, directed to the public at large and more particularly to those responsible

for the operation of the schools. It imposed a legal and moral obligation upon officials who had created or maintained segregated schools to undo the damage which they had fostered. And, compliance with the Supreme Court's edict was not to be less forthright in the North than in the South; no double standard was to be tolerated.

The Brown decision also increased the public agitation for change in New Rochelle. But the Board paid little heed to the Brown doctrine, finding nothing in its conduct repugnant to Brown. In 1955 a survey of the physical facilities of the New Rochelle schools, conducted by the engineering firm of Englehardt, Englehardt and Leggett, revealed that the Lincoln building was obsolete and thus would have to be retired. This conclusion reinforced the findings of a 1948 engineering survey conducted by Leland Hubbell Lyon. The report recommended that both the Lincoln and Washington schools be closed, and a combined school be built on the present Lincoln site.[6] With the necessity for making some change thus forced upon the Board, it was thereby given an additional opportunity to eliminate segregation. Once again, no action was taken in this direction.

In December of 1956, a committee representing fourteen civic groups interested in ameliorating the Lincoln situation requested the Board to have a study of the problem made by the New York State Department of Education. As a result, at the Board's request, Mr. Theron Johnson, an experienced, high-ranking administrator in the Department, came to New Rochelle, conducted interviews and discussions, and surveyed the Lincoln problem. At the same time, the Board proposed for the first time to rebuild Lincoln on the same site. This proposal was included in a comprehensive school referendum to be submitted to the voters in the spring of 1957. Mr. Johnson submitted his final report to the Board on March 25, 1957, at which time the date for the

6. The two schools are less than one-half a mile apart and Washington school is only partially filled.

referendum was approaching.[7] Johnson pointed out that

> "[t]he actions of previous Boards running back over the years contributed to your present de facto segregation."

He said:

> "[a]lthough the Board of Education has frequently expressed its dissatisfaction with the existence of a predominantly Negro elementary school in New Rochelle, it has not fully taken the responsibility to implement its policy of integration. Although the Board of Education cannot be blamed for a residential pattern which facilitates segregation, it does have the responsibility to take the leadership in finding a way out. The impact is strongest on the schools and affects educational achievement and psychological development. If the Board does not take the leadership no one else will.

> "In studying the existing school attendance lines there were many instances where the boundary seemed to be neither reasonable nor consistent. It could only appear that special interests had been permitted to effect the assignment of children to schools. When this situation exists doubt will remain in the minds of many residents as to the Board's intent."

Johnson's report concluded with a challenge to the Board: a challenge to meet its obligations, and to take the leadership in ending segregation. He wrote:

> "In summary, then we can say there have been no 'solutions' achieved. The search must continue but in a fashion which is productive and in a way which can draw the community together. The opportunities lie before the Board of Education and its administrative officials.

You have the decision in your own hands." (Plaintiffs' Exhibit 15.)

The Board's response to this challenge was somewhat less than edifying. The Board's president, Mr. Frederic Davidson, wrote immediately to the Commissioner of Education, asking that the report, which the Board itself had initially requested, be recalled and repressed. The Commissioner of Education acceded to the Board's request and the report was withdrawn. Meanwhile, undoubtedly due in large part to the publicity which the report had received, the portion of the referendum calling for a replacement of the Lincoln School was defeated by the voters.

Johnson's report had recommended, inter alia, that a comprehensive community study of the problem be undertaken. Accordingly, the Board hired a distinguished group of educators, psychologists and sociologists, headed by Dr. Dan Dodson, one of the country's foremost experts on the problems of integration. In December of 1957, this group after an exhaustive study, delivered its report, entitled "Racial Imbalance in Public Education in New Rochelle, New York" (popularly known as the Dodson Report). This report, like that of Mr. Johnson, concluded that the Board had been derelict in its duties, and remiss in its attitudes. Moreover, Dr. Dodson testified that his initial proposed report had been even more severe in its criticism of the Board, but that the final report submitted had been toned down so as to make it more acceptable. The Dodson Report framed the essential issue involved as follows:

> "Specifically, if the Board of Education in the past, operating in a different social setting, encouraged or permitted the present situation to develop, does the present Board of Education have the obligation to undo any damages which may have accrued under previous decisions of its predecessors? Does the present

---

7. It is noteworthy that the Board decided to replace Lincoln School without waiting for Mr. Johnson's final report, which was to deal with the Lincoln problem.

Board have an obligation to eradicate the imbalance of races in the Lincoln School which was permitted to develop under previous Boards?" (page 9.)

The Report pointed out that

"It is basically through the mechanism of the public school that members of a group occupying an inferior position in our society can achieve equal opportunities. Help in breaking down economic, social and cultural barriers should begin with the public schools." (page 16.)

Comparing the situation to that involved in the Brown case, the Report said:

"It seems that morally the situation is little different than the situation which the United States Supreme Court in 1954 found to generate 'a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.'" (page 18.)

Dodson pointed out that change in New Rochelle was necessary; new facilities were required. Thus, the Board was faced with the necessity of dealing with the racial problem at once. Procrastination had to give way to action.

"The Board must realize that any building or utilization plan it adopts will implicitly make this decision. It is not possible to avoid the question of whether racial imbalance is going to be alleviated or encouraged. To do nothing about it is to encourage racial imbalance. To do nothing about it is a decision just as powerful and as important as a decision to try to do something about the imbalance." (page 19.)

The Report pointed out that the Board alone was in a position to immediately alleviate segregation:

"At this time the Board of Education is in a position to eliminate de facto segregation in schools by its decision on a matter which has to be resolved—namely how to accommo-

date the increasing numbers of students in the public schools of New Rochelle. Obviously the racial imbalance in the school is related to the housing patterns. The housing patterns, however, cannot be changed overnight. The school district boundaries can." (pages 19–20.)

The Dodson Report discussed the concern for "status" of various schools which has apparently been a strong motivating factor in the Board's conduct through the years.

"The panel was puzzled that in a city as dynamic as New Rochelle, in a decade, with insignificant exceptions, few children from the outside have ever been sent into the three schools located in the low socioeconomic status neighborhoods." (page 34.)

Dodson commented on

"What seems to be a lack of willingness on the part of the Board to move district lines"

and found that

"Acquiescence has heightened concern as to the 'status' of one school as against another with the result that there is almost a 'phobia' about the district lines in several of the schools surrounding Washington, Lincoln and Columbus." (pages 34–35.)

The experts found, as a result of the survey, that the Board had been largely responsible for the situation.

"The panel believes the Board of Education has adhered too rigidly to established district lines for elementary schools. It has tended to make under-use of some facilities at the expense of over-crowding in others. This policy has reinforced the 'status appeal' of some schools and depreciated others. It has helped fragment the community into neighborhoods identified by school attended and made more provincial the experience of all children." (page 41.)

With respect to the rebuilding of Lincoln School, Dodson said:

"To do so would further reinforce the segregation of Negroes. It would leave two schools in the same neighborhood (Washington and Columbus) only partially used, and it would reinforce community fragmentation." (page 43.)

The Dodson Report concluded with two comprehensive proposals designed to eliminate segregation in Lincoln School, and to provide a more balanced educational experience throughout the community. The first, and favored, alternative provided for

(1) The rebuilding of a larger Lincoln School on the same site;

(2) The discontinuance of Washington School;

(3) Extensive redistricting; and

(4) The more flexible use of the neighborhood school policy in the future.

Dodson's second proposal involved the use of K–3 schools (Kindergarten through third grade) so as to allow for greater flexibility in districting. Dodson made it clear that each of these two recommendations was submitted

"as *an integrated whole*, rather than a series of separable proposals." (page 3.)

The Dodson Report, in short, indicated clearly to the Board that it alone had the responsibility of determining whether segregation in New Rochelle would continue. But, once again, the Board took no action whatsoever to implement the Dodson recommendations, or any of the other proposals submitted to it by interested persons and groups, such as permissive zoning and dispersal of Lincoln pupils. (See Defendants' Exhibit G.) Of significance in interpreting this inaction is Dr. Dodson's testimony that during the course of the survey, he lost faith in the Board's sincerity and willingness to come to grips with the racial problem. (Record, pages 413–14.)

One reason persisted in by the Board as an excuse for its failure to act was the administrative difficulties and costs involved in making any changes. However, it is noteworthy that no comprehensive survey of costs was ever undertaken. (Record, page 589.) Moreover, the difficulties allegedly envisioned in allowing Lincoln pupils to travel to other schools do not seem overly substantial. Although, in the north end, some children live as much as a mile from the school which they attend (Record, page 725), the radius of the Lincoln District is only a quarter of a mile. In addition, several of the schools in districts adjoining Lincoln are within half a mile of the Lincoln School. (Defendants' Exhibit RR.) Thus, even if Lincoln pupils were allowed to attend other elementary schools, their journey would still not be as great as that of many of these north-end children.

In November of 1959, the Board decided again to propose only the rebuilding of Lincoln School on its present site, despite the admonition of the Dodson Report that this course of action inevitably would lead to the furthering of segregation. Although both Dodson and Johnson had indicated that, unless the Board assumed positive responsibility, segregation would inevitably continue, the Board stated, in a resolution dated November 30, 1959:

"The solution to the problem of racial, religious or other concentrations of children does not lie with the schools, but rather with the community and its living patterns." (Defendants' Exhibit I.)

This proposal was to be put to the voters by way of a referendum in May of 1960. The Board's activities in an attempt to gain public support for the proposal give strong indication of the absence of good faith in meeting its obligations. It permitted the issue of segregation to be insinuated into the referendum campaign, to the extent that all other factors became obscured. The "status" fears of persons in the districts bordering Lincoln were fostered.[8] Thus,

8. The attitude of persons within the districts bordering Lincoln is illustrated by a statement prepared by the Mayflower Parent-Teachers Association at a time when the Board was still considering

principals in schools in these districts sent letters to parents urging support of the Lincoln proposal, indicating that integration was the primary issue and intimating that if Lincoln were not replaced, Negroes might be transferred in large numbers to the schools which their children were presently attending. (See Plaintiffs' Exhibits 20 and 21; see also Record, pages 153, 161–162, 547, 606, 611–612.) Although the Board had disciplinary authority over these school officials when acting in their official capacity, it took no action to censure them, or suppress the letters in any way. It insisted instead that the principals were merely exercising freedom of expression. Surely this is not the conduct of a public body seeking in good faith to reach a legitimate solution to a racial problem.

The Board itself participated more directly in similar acts. In an advertisement, which Superintendent of Schools, Herbert C. Clish, admitted was prepared by the Board's Referendum Committee (Record, pages 615–616, 619–620), opponents of the Lincoln proposal were branded as "extremists and propagandists" (Plaintiffs' Exhibit 9), despite the fact that numerous reputable civic organizations had publicly announced their opposition to it. In the same advertisement, the taxpayers of New Rochelle were warned of harsh financial consequences if the Lincoln proposal were defeated. The taxpayers were reminded that if the proposal failed, the new school could be built with five-year bonds, a procedure which would greatly increase taxes in the city. Thus, the Board made it clear that it saw only one course of action: rebuild the Lincoln School on its present site. This, as Dodson made clear, could mean only the continuing of segregation at Lincoln.[9]

In addition, there was testimony as to pressure applied by Dr. Clish on PTA officials who were reluctant to support the Lincoln proposal and the advertisement to be placed by the Board's Referendum Committee. (Record, pages 172–174.) And, in the advertisement, it was stated that the Lincoln PTA had endorsed the proposal, when in fact it had never met

---

alternatives to the replacement of Lincoln. The statement read, in part:

"In several schools where a well-integrated situation exists, the proportion of Negro students is steadily increasing each year. Even in those Mayflower neighborhoods where housing integration does exist, the turnover of homes is almost invariably from white to Negro owners. In recent years, the proportion of Negro students at Mayflower has risen approximately two percent each year. Lincoln School rezoning would certainly hasten this process."

The statement criticized the Dodson proposals, commenting:

"At the same time, the plan will increase the proportion of Negro children in several neighboring schools to such a degree that even according to Dodson's own quotation, a very rapid shift in proportion is likely to follow * * *." (Plaintiffs' Exhibit 14.)

It was testified that this statement was received by the Board. (Record, pages 301–302.)

At approximately the same time, the President of the Daniel Webster Parent-Teacher Association wrote a letter to the Board, which read, in part, as follows:

"For several years Daniel Webster has been a well integrated school. Because the increase of non-white pupils has been gradual, the neighborhood and school itself has been able to adapt and achieve a well integrated atmosphere. * * *

" * * * [t]he Daniel Webster Parent-Teacher Association is most concerned about the recommendation in the Dodson Report to increase the non-white population in this school to something around thirty per cent. Any such move that would amount to a sudden readjustment in the school population would, in the opinion of the PTA, accelerate beyond control this normal and quite gradual adaptation that has been taking place in the school and neighborhood over the past several years. * * *

"The Daniel Webster School Parent-Teacher Association Board cannot overemphasize what it feels to be a most important consideration, and that is the equilibrium of the student body * *." (Plaintiffs' Exhibit 13.)

9. This would follow necessarily from the Board's policy of refusal to allow children to transfer to schools in other districts.

to consider the matter. (Record, pages 77–78, 534.) At any rate, these pressures were successful, and the voters passed the Lincoln proposal by an overwhelming three-to-one majority. It is significant that although the Board constantly reiterated that the new school was being built to benefit the Lincoln district, this was the only district in which the proposal was defeated.

This, then, completes the picture of Board intransigence and refusal to act through the years. The "freeze" placed by the Board in 1949 on the already gerrymandered boundaries of the Lincoln district remained unchanged, despite eleven years of public agitation, pleas and advice from distinguished educators and sociologists. And, what is more, the Board has not evidenced any intention to change its policies in the future.

### The Law

#### I.

■ Any discussion of the applicable law must begin with the case of Brown v. Board of Education, supra. Principles long accepted by psychologists and sociologists were given the stature of the law of the land. The Supreme Court made it clear that in the field of public education, separate but equal was inherently unequal, and hence violative of the Constitution. Thus, the operation of separate schools for whites and Negroes was proscribed. Those school authorities throughout the country which had operated such separate schools were instructed to implement desegregation, in good faith, "with all deliberate speed." See Brown v. Board of Education, 1955, 349 U.S. 294, 301, 75 S.Ct. 753, 757, 99 L.Ed. 1083.

I hold that the Board of Education of New Rochelle, by its conduct in the years prior to 1949, created and established the Lincoln School as a segregated, Negro school. Thus formulated, the present case falls squarely within the plain meaning of the Brown decision.

The Board contends that since Lincoln School is not in form a component of a dual system of education for whites and Negroes such as was invalidated by Brown, and since the school contains 94% Negroes rather than 100% Negroes, there can be no violation of the Fourteenth Amendment or of the Brown principles. But, this contention misconstrues the underlying premise of the Brown rationale. That opinion, while dealing with a state-maintained dual system of education, was premised on the factual conclusion that a segregated education created and maintained by official acts had a detrimental and deleterious effect on the educational and mental development of the minority group children. The unanimous Court, speaking through Chief Justice Warren, declared that segregation of Negro children, especially in their formative years, "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." 347 U.S. at page 494, 74 S.Ct. at page 691. The Court further emphasized the necessity of giving these minority-group children the opportunity for extensive contact with other children at an early stage in their educational experience, finding such contact to be indispensable if children of all races and creeds were to become inculcated with a meaningful understanding of the essentials of our democratic way of life. That the benefits inherent in an integrated education are essential to the proper development of all children has been reiterated time and again by the many witnesses in the present case, including those called by the defendant.

■ With these principles clear in mind, I see no basis to draw a distinction, legal or moral, between segregation established by the formality of a dual system of education, as in Brown, and that created by gerrymandering of school district lines and transferring of white children as in the instant case. Cf. Gomillion v. Lightfoot, supra. The result is the same in each case: the conduct of responsible school officials has operated to deny to Negro children the opportunities for a full and meaningful educational experi-

ence guaranteed to them by the Fourteenth Amendment. Further, the fact that the Lincoln School contains approximately 6% whites, surely cannot divest Lincoln of its segregated character. In a community such as New Rochelle, the presence of some 29 white children certainly does not afford the 454 Negro children in the school the educational and social contacts and interaction envisioned by Brown.[10]

■ Having created a segregated school, the Constitution imposed upon the Board the duty to end segregation, in good faith, and with all deliberate speed. It is patently clear that this obligation has not been fulfilled.

The Board argues that the study which it has given to the problem, and the surveys which it has requested, conclusively indicate its good faith. But, history is made, and constitutional rights vindicated, by deeds, not by talk, resolutions, and fine phrases. As already indicated, the Board has discussed the problem, hired experts, made surveys, and constantly reiterated verbally its belief in racial equality and the necessity for equal opportunities. But the fact remains that, in eleven years, not one single act was taken to implement these expressed principles. And, the Board's attitude, as indicated by its overt conduct, has been one of negation; it has publicly disclaimed all responsibility for the Lincoln problem.

The Board urges, however, that its decision to rebuild the Lincoln School on the same site constitutes a start in the right direction, since it is the first step outlined in the Dodson proposals.[11] But, the Board has indicated that it has no intention of implementing the remainder of these proposals, which Dr. Dodson stated must be considered as an integrated whole. Dr. Dodson testified at the trial that the Board's decision did violence to the spirit of his report. (Rec-

ord, page 439.) Thus, it is most difficult to conceive of the rebuilding of the Lincoln School as good-faith compliance with an obligation to desegregate. In fact, this seems the one sure way to render certain continued segregation at Lincoln.

The Board attempts to excuse its inaction on the ground that admittedly there is no "ideal" solution to the Lincoln problem. But, inability to find a perfect answer is hardly justification for refusal to do anything. Alternatives have been proposed by experts and prominent civic organizations. While not perfect, they contained much merit and offered a decided improvement over the Board's policy of inertia. It hardly need be stated that there is never an ideal solution when the question of desegregation is faced squarely. Experience in the south has made clear, that the problems to be met in this area are most difficult and delicate. They involve the most intense, deep-seated aspirations and prejudices of persons and groups. Therefore, there can never be a solution which could conceivably please everyone. But, if this alone were sufficient to excuse inaction, progress in this vital area of human rights would be nonexistent. I cannot accept the proposition that in this relatively small community in the north, men of good will, wisdom and ingenuity could not have devised a plan for the orderly desegregation of the Lincoln School.

If school boards could satisfy their obligations under the Fourteenth Amendment merely by waiting complacently until an "ideal" solution presented itself, the Brown decision, and the advances in the area of individual equality which it represents, would be a virtual nullity. Brown, if it meant anything, meant much more than this. Necessarily implied in its proscription of segregation was the positive obligation of eliminating it. This obligation requires both good faith, and action with dispatch, and I am com-

---

10. The converse of this situation occurred in Gomillion v. Lightfoot, supra, where the fact that a few Negroes were left within the city limits did not alter the illegal nature of the challenged rezoning.

11. Actually, Dr. Dodson proposed a larger school at Lincoln to serve as a more workable basis for redistricting and integration.

pelled to the conclusion that the Board of Education of New Rochelle has complied with neither of these requirements in the present case.

II.

I also conclude that if a Board of Education enters into a course of conduct motivated by a purposeful desire to perpetuate and maintain a segregated school, the constitutional rights of those confined within this segregated establishment have been violated.

This principle has already been recognized by the courts. In Henry v. Godsell, D.C.E.D.Mich.1958, 165 F.Supp. 87, the Negro plaintiffs moved to enjoin the construction of a new school in an area predominantly populated by Negroes. The court denied the injunction, finding that the plaintiffs' constitutional rights had not been violated, but only after a specific finding that the school board had acted in good faith, and that its policies "were not motivated by racial considerations." 165 F.Supp. at page 91. The court clearly considered the issue of intent and purpose to be controlling.

In Sealy v. Department of Public Instruction of Penn., D.C.E.D.Pa.1957, 159 F.Supp. 561, affirmed 3 Cir., 252 F.2d 898, certiorari denied 1958, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1149, Negro children attacked the proposed location of a new junior high school as racially discriminatory. The court denied the injunction sought, but once again only after a specific finding of lack of intent to discriminate. The court found that

"[t]he record discloses in no instance a single iota of testimony that the consideration of the Darby Township School District Board, in the selection of the site for the proposed new junior high school and its construction thereon, was motivated by any racial discrimination whatsoever * * *." 159 F.Supp. at page 563.

and its principal conclusion of law was that

"None of the defendants herein named was in any way racially motivated, nor was any discrimination whatsoever regarding race exercised by any or all of them in the selection of the site or the approval given for the construction of a proposed junior high school in the upper section of Darby Township." 159 F.Supp. at page 566.

These cases clearly imply their converse: if a Board of Education selects a school site, or otherwise operates its schools, with a purposeful desire to segregate, or to maintain segregation, the Constitution has been violated. See also Clemons v. Board of Education of Hillsboro, 6 Cir., 228 F.2d 853, certiorari denied, 1956, 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868; Holland v. Board of Public Instruction, 5 Cir., 1958, 258 F. 2d 730. If such motivation is present, it makes no meaningful difference whether the segregation involved is maintained directly through formal separation, or indirectly, through over-rigid adherence to artificially created boundary lines, as in the present case. Similarly, it is of no moment whether the segregation is labelled by the defendant as "de jure" or "de facto", as long as the Board, by its conduct, is responsible for its maintenance.[12]

Constitutional rights are determined by realities, not by labels or semantics. The Supreme Court has affirmed that courts must look through the guise in which school officials seek to clothe their unconstitutional conduct. The Court said, in Cooper v. Aaron, 1958, 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5:

"It is, of course, quite true that the responsibility for public education is primarily the concern of the States, but it is equally true that such responsibilities, like all other

12. It is submitted that if these terms must be used, "de jure" should refer to segregation created or maintained by official act, regardless of its form. "De facto" should be limited to segregation resulting from fortuitous residential patterns. This decision does not purport to determine whether "de facto" segregation, in this sense, is violative of the Constitution.

state activity, must be exercised consistently with federal constitutional requirements as they apply to state action. The Constitution created a government dedicated to equal justice under law. The Fourteenth Amendment embodied and emphasized that ideal. State support of segregated schools *through any arrangement,* management, funds, or property cannot be squared with the Amendment's command that no State shall deny to any person within its jurisdiction the equal protection of the laws. The right of à student not to be segregated on racial grounds in schools so maintained is indeed so fundamental and pervasive that it is embraced in the concept of due process of law." (Emphasis supplied.)

Turning to the realities of the instant case, the inference is inescapable that the Board's deliberate intransigence and inflexibility for the last eleven years in the face of public pressures and expert advice were motivated by a desire to continue Lincoln School as a racially segregated school, and thus not to alter the racial balance in the city's other elementary schools. This becomes especially clear when the Board's conduct subsequent to 1949 is examined against the background of the pre-1949 gerrymandering and transfer of white children. No other rational purpose can be attributed to the Board's almost fanatically rigid adherence to district lines which were established in the first instance out of a desire to separate whites and Negroes. This utter inflexibility has been sharply criticized by Mr. Johnson and Dr. Dodson, both of whom came to New Rochelle at the Board's invitation, and both of whom were led to seriously question the Board's good faith. Not one proposal which would alleviate segregation, submitted by these experts and others, has ever been instituted by the Board, even on an experimental basis. When this course of conduct is viewed in its totality, the desire to maintain segregation is clear. This does not necessarily mean that in-dividual members of the Board are segregationists or racists. But it is apparent that they have failed to accept or recognize their moral and legal responsibilities and have chosen instead to yield to pressures of certain groups who wish to avoid an influx of Negro children into the schools in their districts.

██ The defendant argues, however, that the neighborhood school policy is a reasonable and educationally sound one, and thus that it is not violating the Constitution in adhering to it. But, this argument ignores the essential nature of the plaintiffs' position. They are not attacking the concept of the neighborhood school as an abstract proposition. They are, rather, attacking its application so as to deny opportunities guaranteed to them by the Constitution. It is a legal truism that "acts generally lawful may become unlawful when done to accomplish an unlawful end." Western Union Telegraph Co. v. Foster, 1918, 247 U.S. 105, 114, 38 S.Ct. 438, 439, 62 L.Ed. 1006 (Holmes, J.). Moreover, as Justice Frankfurter succinctly noted in his concurring opinion in Cooper v. Aaron, 1958, 358 U.S. 1, 25, 78 S.Ct. 1401, 1413, 3 L.Ed.2d 5:

"Local customs, however hardened by time, are not decreed in heaven."

The neighborhood school policy certainly is not sacrosanct. It is valid only insofar as it is operated within the confines established by the Constitution. It cannot be used as an instrument to confine Negroes within an area artificially delineated in the first instance by official acts. If it is so used, the Constitution has been violated and the courts must intervene.

This principle is well illustrated by the litigation involving desegregation of schools in Delaware. In Evans v. Buchanan, D.C.D.Del.1959, 172 F.Supp. 508, 516, the court was required to pass upon the constitutionality of a desegregation plan submitted by state officials. The court approved a large portion of the plan, but disapproved a section providing

"Whenever possible, every pupil in the grades affected * * * shall

have the choice of (a) attending the nearest school within the district in which he resides or (b) attending the school he would have attended prior to the effective date of this order."

In effect, therefore, the authorities were attempting to institute a neighborhood school policy. The court ordered this provision stricken from the plan, commenting

"Now, it is a fact that in Georgetown, for example, the majority of the Negroes live in a community known as The Hill. The colored school is close by. The white school is at a much. greater distance. Interpreting the language * * * in the light of these facts, it would seem to result that no Negro student whose family resides on The Hill may ever enter the white school. Whatever may have been the reasons for this provision, it strikes me as unfair and is ordered to be stricken." 172 F.Supp. at page 516.

When later asked to restore this provision to the plan, the court refused, and pointed out:

"Read against a background of geographical facts of which judicial knowledge may be taken, it provided that in many localities no colored student could ever attend a white school unless his parents thereafter changed their residence to a point closer to the white school than the colored school." Evans v. Buchanan, D.C.D.Del.1959, 173 F.Supp. 891, 892.

The court thus indicated that it would not permit the school authorities to confine integration to a bare token under the guise of a neighborhood school plan. The Evans decision clearly answers the Board's contention that since Negroes are free to move to other districts, they are not being required to attend a segregated school. Moreover, the Board indicates a naiveté in not recognizing the difficulties inherent in changing long established residential patterns.

The Board raises several other contentions in an attempt to justify its conduct. With respect to its refusal to institute permissive zoning, or to allow the Negro children to register at other schools at the start of the 1960 school year, the Board argues that it would be violative of the law to accord Negroes special privileges not allowed to other minority groups. It points to the fact that several other elementary schools in New Rochelle have student compositions which are primarily of one religious or national-origin group, and argues that if permissive zoning privileges were afforded to the Lincoln pupils, the same privileges would have to be given to these other minorities. This, it says, would produce chaos throughout the school system. But, the Constitution is not this color-blind. The Brown decision dealt only with Negroes; it was based on factual findings which may not be applicable to other minority groups. Furthermore, the chaos envisioned by the Board seems more fanciful than real, since no other groups or persons in New Rochelle have requested permission to attend schools outside the district in which they reside. Nor, is there evidence that any other school district was gerrymandered or deliberately set-up to embrace an ethnic group. In addition, there are instances where it is not only justified, but necessary, to provide for such allegedly "unequal treatment" in order to achieve the equality guaranteed by the Constitution.[13]

■■ The Board also contends, with respect to its decision to rebuild Lincoln School on its present site, that it is empowered by state law with the au-

13. The Board undoubtedly was aware of the permissive zoning policy instituted in New York City to cure a similar situation, under which children attending schools with a heavy concentration of Negroes and Puerto Ricans are permitted to transfer to underutilized schools with a more heterogeneous racial composition. The defendant Board could not seriously have believed that, because of this policy, the New York City Board of Education was violating the Constitution. (See Supplemental Exhibit I.)

thority and duty to select locations for schools. The existence of this authority, however, is not questioned by the plaintiffs. But this power, like any other, must be exercised in accordance with the demands of the Constitution. See Cooper v. Aaron, 1958, 358 U.S. 1, 19, 78 S.Ct. 1401, 3 L.Ed.2d 5; Cf. Henry v. Godsell, supra; Sealy v. Department of Public Instruction of Penn., supra. Similarly, the fact that the people of New Rochelle overwhelmingly approved this proposal by referendum is of no legal significance. Constitutional rights can certainly never be made dependent upon public choice; the consequences if they were, need hardly be labored.

Finally, the Board's principal contention, which it has asserted throughout these proceedings, is that the existence of an all-Negro or a predominantly-Negro school is not, in and of itself, a violation of the Constitution. The constant reiteration of this argument indicates the Board's preoccupation with semantics at the expense of realities. This is not a case where the existence of an all-Negro school is an unfortunate fortuity. The Lincoln School was established as an all-Negro school by the gerrymandering of district lines, and by the transfer of white children residing in the district to schools outside the district. The Board of Education of the City of New Rochelle was responsible for both of these policies. Subsequent to 1949, the Board by its arbitrary rejection of all proposals for change has purposefully maintained Lincoln as a segregated school. This decision is rendered on the facts in this case and holds that, in the instant situation, Constitutional rights have been violated.

In conclusion, the words of Justice Frankfurter in Cooper v. Aaron, supra, indicating the attitude with which responsible public officials must necessarily approach these problems, bear repetition:

"That the responsibility of those who exercise power in a democratic government is not to reflect inflamed public feeling but to help form its understanding, is especially true when they are confronted with a problem like a racially discriminating public school system. This is the lesson to be drawn from the heartening experience in ending enforced racial segregation in the public schools in cities with Negro populations of large proportions. Compliance with decisions of this Court, as the constitutional organ of the supreme Law of the Land, has often, throughout our history, depended on active support by state and local authorities. It presupposes such support. To withhold it, and indeed to use political power to try to paralyze the supreme Law, precludes the maintenance of our federal system as we have known and cherished it for one hundred and seventy years." 358 U.S. at page 26, 78 S.Ct. at page 1413.

Litigation is an unsatisfactory way to resolve issues such as have been presented here. It is costly, time consuming—causing further delays in the implementation of constitutional rights—and further inflames the emotions of the partisans. Men of good will, such as the individual members of the Board submit they are, could have solved and still can solve the problem by exercising the judgment and understanding for which they presumably were chosen. The School Board is a public body charged with a public responsibility. This responsibility must be exercised solely in the best interests of the children attending the schools. The Board cannot relieve itself of this responsibility by giving the community whatever result might gratify the impulse of the moment. Nothing can be permitted to conflict with the Board's moral and legal obligation.

### The Decree

In determining the manner in which the Negro children residing within the Lincoln district are to be afforded the opportunities guaranteed by the Constitution, I will follow the procedure authorized by the Supreme Court in Brown v. Board of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, and utilized by many district courts in implementing

the Brown principles. Thus, I deem it unnecessary at this time to determine the extent to which each of the items of relief requested by plaintiffs will be afforded. Instead, the Board is hereby ordered to present to this Court, on or before April 14, 1961, a plan for desegregation in accordance with this Opinion, said desegregation to begin no later than the start of the 1961–62 school year. This court will retain jurisdiction of this action until such plan has been presented, approved by the court, and then implemented.

The foregoing Opinion will constitute the court's findings of fact and conclusions of law.