See also 195 F.Supp. 231.

**Leslie TAYLOR and Kevin Taylor, minors, by Wilbert Taylor and Hallie Taylor, their parents and next friends, et al., Plaintiffs,**

v.

**The BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF the CITY OF NEW ROCHELLE,**

and

**Herbert C. Clish, as Superintendent of Schools of the City School District of the City of New Rochelle, Defendants.**

United States District Court
S. D. New York.

June 24, 1963.

Paul Zuber, Croton-on-Hudson, N. Y., for plaintiffs.

Murray C. Fuerst, New Rochelle, N. Y., for Board of Education.

Robert M. Morgenthau, U. S. Atty., by Eugene R. Anderson and David R. Hyde, New York City., amici curiae.

KAUFMAN, Circuit Judge.

In less than ten years, the legal and social complexion of our nation has undergone a dramatic change. The epochal decisions of the United States Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), have worked a revolution in American race relations. The tempo of that revolution is ever quickening and its reverberations have not been confined to any one part of our nation. Indeed, the President of the United States has recently noted that the problem of equal opportunity regardless of race is "not a sectional problem—it is nationwide."

The truth of this statement is confirmed by the case history of New Rochelle's Lincoln School integration litigation, the judicial phases of which are, hopefully, drawing to a close. In order that the application now before this Court may be set in context, a brief statement of that history will be undertaken.

New Rochelle, a suburb of New York City is, as we know, located in southeastern Westchester County. In late 1960, a class action was initiated in this court by several Negro children enrolled in the Lincoln School, a public elementary school operated by the Board of Education of the City of New Rochelle, which was named as one of the defendants. In this action, the plaintiffs charged that Lincoln School, situated in central New Rochelle, then with an enrollment of ap-

proximately 94% Negroes, had been deliberately created and maintained by the Board as a racially segregated school in violation of the Fourteenth Amendment to the federal Constitution. After a trial, this Court found, 191 F.Supp. 181 (S.D. N.Y.1961), that the school board, in 1930, had gerrymandered the district in which the Lincoln School was located in order that a large portion of its white students would be excluded and permitted to attend the nearby Webster and Mayflower schools; that within the four years following, the boundaries of the Lincoln district were manipulated so as to incorporate the ever-increasing Negro population; that until 1949, the Board assured the continuance of Lincoln School as a Negro school by permitting white students resident within the district to transfer to schools outside the district; and that after 1949, when further transfers were forbidden, the school board did nothing to alter the status quo or to ameliorate the serious racial imbalance in the Lincoln School which it had caused to be brought about.

It followed, therefore, that this Court was constrained to find that the deliberate efforts to maintain the Lincoln School as a segregated educational institution worked a deprivation of the equal protection of the laws constitutionally proscribed by the Fourteenth Amendment as interpreted by the Supreme Court in Brown v. Board of Education, supra. As I noted at that time, "The conduct of responsible school officials has operated to deny to Negro children the opportunities for a full and meaningful educational experience guaranteed to them by the Fourteenth Amendment." 191 F.Supp. at 192–193.

In order to cure this social illness, this Court directed the Board to present a plan to remedy the illegality. The Board proposed such a plan which, with considerable modification, was adopted as the decree of the Court, in May 1961. 195 F.Supp. 231 (S.D.N.Y.), aff'd 294 F.2d 36 (2d Cir.), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961).

In essence, the decree provided for a completely optional transfer of all Lincoln students to any schools having sufficient room to receive them without the imposition of any requirements for minimal academic achievement or emotional adjustment. Further provisions were incorporated in order fully to effectuate the spirit of the optional transfer plan; but, the decree provided that the Board was under no obligation to furnish transportation to pupils transferring under the terms of the decree. The decree concluded with the provision that "The Court shall retain jurisdiction over this case to assure full compliance with this decree." This Court, then, is still seised of jurisdiction over this case and over the administration of the terms of the decree.

I now have before me an application by the present School Board—whose composition is substantially different from that of the Board at the time of the original decree—seeking certain amendments and modifications of that decree.

It is clear that this application has been precipitated by the changing circumstances in New Rochelle which have followed upon the Board's efforts to comply with this Court's order. On the date of the commencement of this litigation, Lincoln School had an enrollment of 483 students, of whom 454, or 94%, were Negro. As a result of the transfer of Lincoln students to the city's eleven other elementary schools, the percentage of Negro students dropped immediately to approximately 89%. A year and a half later, in April 1963, the entire student population at Lincoln School was less than half what it was when this Court entered its decree; only 210 pupils had chosen to remain enrolled at this antiquated school, constructed 65 years ago.

The economic and social impact of this mass exodus has been perceptively analyzed and extrapolated by the present forward-looking School Board. The operation of Lincoln School has become economically unfeasible due to the great-

ly diminished size of the student body; as of April of this year, although the average annual per capita cost of education in all the New Rochelle elementary schools was approximately $877.00 per student, the cost of educating a student at Lincoln was somewhat more than $1,057.00. As the student body will continue to decrease, the cost per Lincoln School student will increase. It has become obvious to the present Board that the Lincoln School must be closed and permanently shut down.

But more at the heart of this proceeding is the School Board's fear—grounded in a sincere desire to conform not only with the letter but with the spirit of this Court's decree—a fear that the continuation of the plan of free optional transfer, pursuant to the terms of the decree, will result in an unbalanced racial population in schools adjacent to the Lincoln district. The Board in effect urges that strict compliance with the original decree, now that Lincoln School is being closed down, will pose a serious threat of de facto racial segregation in those contiguous schools, if the remaining students at Lincoln are permitted to exercise a free choice of school to be attended.

The School Board and its enlightened Superintendent of Schools, Dr. David G. Salten, a nationally recognized educator —after holding two public hearings in May of this year, at which 1300 and 900 citizens, respectively, were in attendance and 98 speakers heard; after attending many meetings of PTA groups, and civic and neighborhood associations; and after consulting with experts in the field and with those representing the interests of the Negro population of the Lincoln district—therefore asks this Court to amend and modify the letter of the decree in order that its spirit may best be perpetuated.

In my original opinion in this litigation, I expressed my sincere belief in the proposition that the desegregation problem in the Lincoln district could be solved by "men of good will, wisdom and ingenuity." 191 F.Supp. at 193. It is gratifying that, among the membership of the present School Board, New Rochelle has found such men. It is obvious that these are men of heart and of broad vision. They have taken a most commendable and farsighted step in projecting the philosophy which underlay the original decree—and by their action will minimize or perhaps avoid the problem, plaguing so many other communities, of racial imbalance in their system of education.

Obstruction, delay, and unrest have characterized much of our national struggle against educational and racial inequality. But this small Northern community—whose population, composed of various races and religions, might represent our nation in microcosm—has provided this nation with an example and a model of sound public leadership.

Indeed, the immediate and energetic effort of the School Board to comply with this Court's mandate might well be viewed as a precursor of the widely-acclaimed position taken only last week by James E. Allen, Jr., Commissioner of Education for the State of New York. See New York Times, June 18, 1963, p. 1.

The President of the United States recently registered a plea for an end to racial strife, mass picketing and protest meetings which almost inevitably trigger violence. He urged that the forum for solving the racial question be shifted from the streets to the courts. Certainly, that is the first step. But, as I noted in my original opinion: "Litigation is an unsatisfactory way to resolve issues such as have been presented here. It is costly, time consuming—causing further delays in the implementation of constitutional rights—and further inflames the emotions of the partisans." 191 F.Supp. at 197. In short, our legal system can only go so far in inculcating morality. Today, in light of the School Board's appearance before this Court, I feel even more strongly that the task of securing full equality of educational opportunity among the races is best achieved not by a court which is ill-equipped to control the day-to-day problems of educational pol-

icy, but by private citizens, men of good will, prepared to act affirmatively in pursuance of our basic law and with a devotion to community betterment.

Thus, in the instant case, the New Rochelle School Board has taken the initiative and, after investigation and consultation, has proposed several modifications in the May 1961 decree of this Court.

With the closing of the Lincoln School and the accompanying need for enlightened placement of the students living within the Lincoln district, the Board proposes to provide bus transportation to these students on a basis identical to that provided throughout New Rochelle—that is, transportation to any school destination within 1½ and 10 miles of the student's home. As the School Board has stated in its report on its proposed plan to the citizens of New Rochelle: "Transportation will be a key factor in our efforts to maintain an ethnic balance in our elementary schools and to prevent the emergence of segregated schools." See "A Comprehensive Plan for Educational Excellence—A Report to all Citizens of New Rochelle," p. 8 (May 14, 1963). This report (p. 11) further states:

> "Any solution for the problems at Lincoln must be resolved on the basis of what is good for the school system and the community as a whole. Closing the school and transporting its students to outlying areas fulfills this criterion because it avoids tipping contiguous schools and enables students in outlying as well as in the central schools to attend an integrated school."

I have been advised that the additional cost to each of the residents of New Rochelle once the benefits of bus transportation are extended to the students in question will be insignificant. It must also be noted that, pursuant to state law, 90% of the transportation costs incurred in the City of New Rochelle will be borne by New York State in the 1963–64 and successive school years, and only 10% by the city. In short, the burdens resulting from the implementation of the proposed transportation plan are infinitesimal when compared to its benefits.

I am convinced that the closing of Lincoln School, conjoined with free bus transportation for former pupils there to other schools within the city will have a salutary influence in securing true equality of educational opportunity for all parties before this Court. This proposed modification, which would eliminate paragraph 7 of the original order decreeing that Lincoln transferees were to provide their own transportation, is, therefore adopted by this Court.

The more fundamental modification of the decree proposed by the School Board is the deletion of paragraphs 1 and 2 which deal with the optional transfer plan and the substitution therefor of a provision designed to permit the Board to *assign* students residing within the Lincoln district where necessary to secure or maintain racial balance within the elementary school system. Such a provision would repose in the Board discretion in the assignment of pupils in order best to effectuate the principles announced in the original opinion of this Court. Viewing this proposed modification in light of the School Board's demonstrated genuine support for those principles, this Court has decided to so modify its decree. Compliance therewith will be ensured, if ever necessary, by this Court's continued retention of jurisdiction over the case, in pursuance to the final paragraph of the decree and to the general principles of equity.

I wish to thank Mssrs. Fuerst and Zuber who, as counsel for the respective parties, have performed a great service not only to the community and to this Court, but to the entire nation as well.

The decree is modified as provided for in the amended decree entered this day.

As the Board stated in its "Comprehensive Plan for Educational Excellence," supra at p. 2: " * * * the eyes of the entire nation are fixed upon our community and its schools. Our special.

difficulties have received national attention * * *." The nation will now observe how men of compassion and foresight have faced up to the racial problem of their community and with courage undertaken the task of solving it.

## AMENDED AND MODIFIED DECREE

This action having been tried by the Court without a jury and the Court having rendered its opinion on January 24, 1961, and formulated its Decree dated May 31, 1961, and an application having been made to this Court by petition, dated June 20, 1963, of Dr. Frank F. Marino, President of the Board of Education of the City School District of the City of New Rochelle, defendant herein, for a modification of said Decree and the plaintiffs having appeared herein through counsel and having consented thereto.

Now after hearing counsel for the parties hereto and on reading and filing the petition of Dr. Frank F. Marino, President of the Board of Education of the City School District of the City of New Rochelle and the exhibits annexed thereto and the Court having considered the same this Court hereby approves the closing of Lincoln Elementary School as of June 30, 1963, and

It is hereby ordered, adjudged and decreed:

1. Section 1 of the Decree dated May 31, 1961, be and the same hereby is amended to read as follows:

1. Commencing with the 1963–64 school year, the Board of Education of the City School District of the City of New Rochelle shall have the right to assign the students in the Lincoln Elementary School District to the other elementary schools within the School District in such a manner as to achieve the utmost in equality of educational opportunity and to preserve the racial balance in said schools;

2. Section 2, subdivisions (a), (b), (c) and (d) of the Decree dated May 31, 1961, be and the same hereby are eliminated from said Decree;

3. Section 7 of the Decree dated May 31, 1961, be and the same hereby is amended to read as follows:

The Board shall furnish transportation to pupils transferred to schools more than 1½ and less than 10 miles from their residence.

4. In all other respects said Decree of May 31, 1961, shall remain unchanged and of the same force and effect.