Leslie **TAYLOR** and Kevin Taylor, minors, by Wilbert Taylor and Hallie Taylor, their parents and next friends, et al., Plaintiffs

v.

**BOARD OF EDUCATION OF CITY SCHOOL DISTRICT OF CITY OF NEW ROCHELLE**

and

Herbert C. Clish, as Superintendent of Schools of the City School District of the City of New Rochelle, Defendants.

United States District Court
S. D. New York.

May 31, 1961.

Paul Zuber and Thurgood Marshall, New York City (Constance Baker Motley, New York City, of counsel) for plaintiffs.

Murray C. Fuerst, New Rochelle, N. Y., and Julius Weiss, New York City, for defendants.

Burke Marshall, Asst. Atty. Gen., Robert M. Morgenthau U. S. Atty., New York City, Harold H. Greene, Isabel Blair, Attorneys, Department of Justice, Washington, D. C., amici curiæ.

IRVING R. KAUFMAN, District Judge.

I. History of the Litigation

In an opinion dated January 24, 1961,[1] this Court found that the Board of Education of the City of New Rochelle had intentionally created and maintained the Lincoln Elementary School as a racially segregated school, and had not acted in good faith to implement desegregation as required by the Fourteenth Amendment. It was the Court's position that since the Board was responsible for the segregated condition at the Lincoln School, it owed the community the primary obligation to correct it. The Court thus requested the Board to present a plan for the desegregation of the Lincoln School, on or before April 14, 1961, as an aid to the Court in the formulation of a final decree.

The Board by a vote of 6–3, decided to appeal this decision to the Court of Appeals for the Second Circuit, and on March 7, moved orally before me to stay the order requesting submission of a plan until that appeal had been determined. This motion was denied from the bench.[2] The Board then applied to the Court of Appeals for a stay. After oral argument, the Court of Appeals, sua sponte, questioned its appellate jurisdiction at this posture of the case, and instructed counsel to file briefs with respect to this issue. "Because of the

1. This opinion is reported at D.C.S.D.N.Y. 1961, 191 F.Supp. 181.

2. At the same time, the plaintiffs moved for an order directing the defendants immediately to assign the eleven named minor plaintiffs to elementary schools other than the Lincoln School. This motion also was denied from the bench.

time required for the preparation of such briefs and for the Court's determination of the issue of its jurisdiction to hear the appeal at this stage of the proceeding" the Court of Appeals extended the time for the Board to file the desegregation plan until May 3. In an opinion dated April 13, 1961, 2 Cir., 288 F.2d 600, the Court of Appeals concluded that appellate jurisdiction was lacking, and dismissed the appeal as premature.

On May 3, the Board submitted a plan which purported to accord with the Court's opinion and order of January 24. In addition, three members of the Board filed a so-called minority plan which criticized the Board's plan, and contained an independent proposal for desegregation. Objections to the Board's plan were filed by the plaintiffs on May 5. On May 10, a hearing was held to assist the Court in the formulation of its final decree. The evidence adduced at this hearing was primarily directed to a clarification and appraisal of the plan submitted by the Board. On May 15, the Department of Justice was invited to submit a brief amicus curiæ; this brief was filed with the Court on May 24.

## II. The Board's Plan

In view of the obligation resting with the Board to provide for the desegregation of the Lincoln School, the plan submitted by it was given primary consideration in the fashioning of the Court's decree, which is appended to this opinion. Indeed, the Supreme Court, in Brown v. Board of Education, 1955, 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083, instructed the district courts, in connection with the formulation of decrees, to "consider the adequacy of any plans the defendants may propose * * * to effectuate a transition to a racially nondiscriminatory school system." See also Cooper v. Aaron, 1958, 358 U.S. 1, 7, 78 S.Ct. 1401, 3 L.Ed.2d 5.

■ But it is imperative to clarify the context in which that plan must be evaluated. It must be again emphasized that the segregation at the Lincoln School was not a fortuity; it was deliberately created and maintained by Board conduct. The Court found that the Board of Education had gerrymandered school district lines so as to confine Negroes within the Lincoln district, and had allowed white children living within the district to transfer to other schools. It must always be kept in mind, therefore, that there has been a finding of deliberate denial of rights guaranteed by the Fourteenth Amendment to the Constitution. Thus, it does not come with grace for any member of the Board to speak of giving preferential treatment to those who have been unlawfully confined within the Lincoln School district (see Tr. p. 119);[3] they are entitled to nothing less than "full compliance" with the mandate of Brown v. Board of Education, see 349 U.S. at page 300, 75 S.Ct. at page 756, and complete enjoyment of the constitutional rights which previously have been denied to them. These rights cannot lawfully be so enshrouded with conditions and restrictions as to make a sham of the Court's ruling.

■ Nor can academic or administrative criteria be applied so as to preserve officially imposed segregation. These factors must of necessity be subordinated to constitutional rights, and cannot be utilized to prevent the vindication of these rights. "An individual cannot be deprived of the enjoyment of a constitutional right, because some governmental organ may believe that it is better for him and for others that he not have this particular enjoyment. The judgment as to that and the effects upon himself therefrom are matters for his own responsibility." Dove v. Parham, 8 Cir., 1960, 282 F.2d 256, 258. It is in light of these factors that I now proceed to a detailed consideration of the Board's plan.

3. All transcript references herein are to the record of the hearing on May 10, 1961.

The plan submitted by the Board provides as follows:

"Any pupil attending the Lincoln Elementary School, without regard to race, creed, color or national origin, shall be permitted to register and enroll in any elementary school in the New Rochelle Public School System, under the following conditions:

"(1) There shall be available a seat to accommodate the child in the grade to which he seeks admission.

"(2) Admission of out-of-district pupils shall be made only in conformity with the Board of Education's class size policy.

"(3) Any pupil for whom such transfer is sought shall be recommended by his classroom teacher and principal as being able to perform in academically satisfactory fashion on the grade level to which he is assigned, with the recommendation and request being subject to the approval of the Superintendent of Schools.

"(4) Permission granted for such transfer shall be on a year to year basis, with children actually living within the confines of the receiving school district having priority in admission to a given school and seats within the classrooms.

"(5) Any parent requesting such a transfer shall give a written statement expressing his willingness to provide transportation at his own expense.

"(6) The Board of Education reserves the right of flexibility in the administration of the transfer plan in keeping with the overall administration of the school system, since the Board cannot lawfully surrender its powers and duties conferred by the State Education Law.

"(7) All requests for such transfers shall be received annually in the office of the Superintendent of Schools not later than 1 June, preceding the opening of school in September each year except in 1961, the final date being 15 June, 1961."

The plan essentially provides for a system of permissive transfers, whereby under certain restrictive conditions those children residing within the Lincoln district will have the opportunity to register, at their discretion, in any of the eleven other elementary schools in the City of New Rochelle. According to the testimony given at the hearing by Mr. Merryle Stanley Rukeyser, President of the Board of Education, each child is to have a continuing right to elect to transfer from Lincoln at any point during his elementary education experience.

■ It is the Court's opinion that in the circumstances of this case a basic system of permissive transfers will, at this time, provided there are no restrictive conditions, afford the Negro children in the Lincoln district the rights guaranteed to them by the Fourteenth Amendment. Since the complained of condition has existed for such a long period, a decree, of course, cannot at this late date completely undo the effects of the prior gerrymandering and transfer of white children from the Lincoln School. But, it will give each Negro child the opportunity to secure an elementary education free from officially created segregation.

It appears from the exhibits submitted at the hearing that there will be approximately 940 seat vacancies in the eleven elementary schools other than Lincoln for the forthcoming 1961–62 school year. (Plaintiffs' Exhibit 4–A.) On the other hand, the prospective enrollment in the Lincoln School for 1961–62 is only approximately 479. A breakdown of these vacancies by grades indicates that there will be more than sufficient vacancies in the eleven other schools to accommodate all transferees from Lincoln, even if every child at-

tending Lincoln should elect to transfer.[4]

Therefore, I find that at this time the device of permissive transfers will afford the Negro children in the Lincoln district their constitutional rights. Of course, a court of equity fashioning a decree cannot divine every possible eventuality which may arise in the future. If the principle of permissive transfers should prove inadequate to assure complete relief, the Court will be available to consider other methods to afford this relief.

There are, however, several restrictive conditions which the Board seeks to impose upon the transfer right, which, in my opinion, would nullify its effectiveness. These conditions, therefore, have been excluded from the Court's decree. They are especially objectionable in light of the attitude which the majority members of the Board have manifested throughout these proceedings. Respect for the law is a hallmark of our society. Yet the majority members of the Board have clearly manifested a continuation of their attitude of arrogance. The language of the "Preamble" which precedes the Board's plan bears this out. In this "Preamble" the Board reiterates its position that no constitutional rights have been violated, and that "all things considered the present plan of operation best serves the interest of New Rochelle." It points out that its plan is being submitted under protest, and that "It is neither the choice of the Board nor is its adoption recommended." This, despite the findings and opinion of this Court rendered on January 24th.

In its amicus brief the Department of Justice aptly summarized the Board's conduct as follows: "In short, the Board simply reargues its case; it does not accept the Court's ruling." (Brief, p. 4.) This attitude has permeated the actions of the majority members of the Board throughout. They have refused to recognize their obligation of compliance with the Court's ruling, and have, rather, molded their conduct in accordance with what *they* believe the law *should* be. They insist that no court should sit in judgment of their acts and that only these six people have the wisdom and knowledge of the law to determine what is proper and right in the circumstances. In this context, it does not seem that a plan submitted by a Board which, in advance of its adoption, expressly disavows it, is entitled to great weight in determining the content of the final decree.

The Board's restrictive conditions will now be discussed seriatim, and I will indicate, where appropriate, my reasons for rejecting them.

Conditions (1) and (2) both deal with the problem of overcrowding in the receiving schools. Mr. Rukeyser and Dr. Herbert C. Clish, the Superintendent of Schools, testified at the hearing that the plan's reference to the Board's "class-size policy" was intended to indicate maximum class-size—at present 25 for Kindergarten and 29 for Grades 1–6—rather than "ideal" class-size. Since it is clear that there are more than enough vacancies at each grade level to accommodate all transferees without overcrowding, I see no objection at this time to an application of the educationally sound principle of limiting class sizes, provided, of course, that the limitation is based upon a reasonable maximum figure.

But, it must be remembered that overcrowding of schools and classrooms can never be a justification for continued segregation. Mr. Justice Stewart, then a Circuit Judge, expressed this principle in the case of Clemons v. Board of Education of Hillsboro, Ohio, 6 Cir., 228 F.2d 853, 860, (concurring opinion), certiorari denied 1956, 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868: "Overcrowded classrooms, however, are unfortunately not peculiar to Hillsboro, and the avoidance alone of somewhat overcrowd-

---

4. This conclusion is indicated by data compiled by the Superintendent of Schools on May 1, 1961.

ed classrooms cannot justify segregation of school children solely because of the color of their skins." See also Borders v. Rippy, 5 Cir., 1957, 247 F.2d 268. Therefore, should overcrowding be used as an excuse for not complying with the Court's decree, the Court will be available at that time to deal with this problem.

Condition (3) requires a pupil seeking transfer to receive the recommendation of his classroom teacher and principal "as being able to perform in academically satisfactory fashion on the grade level to which he is assigned * * *." This recommendation must be approved by the Superintendent of Schools. Testimony at the hearing indicated that emotional stability also is to be considered in this regard.

■ I find this provision to be plainly contrary to the purport of the Court's opinion of January 24, and to the constitutional principles embodied in the Fourteenth Amendment. See, e. g., Mannings v. Board of Public Instruction of Hillsborough County, 5 Cir., 1960, 277 F.2d 370; Jones v. School Board of City of Alexandria, 4 Cir., 1960, 278 F.2d 72. The Constitution does not provide that only academically superior or emotionally well-adjusted Negroes are to have an opportunity to secure an education free from officially-created segregation; neither does it provide that only those Negroes recommended by school authorities are to have this right. It must be re-emphasized that the Negro children in the Lincoln district are not being given a "privilege"; they are being afforded a constitutional right which has previously been denied them.[5]

There are additional aspects to this provision which give me cause for concern and prompt me to question whether its inclusion in the Board's plan could have been motivated by a desire to discourage transfers. The plan does not contain any specific test by which one can define and clarify the rather ambiguous standard "able to perform in academically satisfactory fashion on the grade level to which he is assigned." Apparently, discretion under this provision is to be unfettered and uncontrolled by any objective criteria. For example, Mr. Charles Romaniello, chairman of the Human Relations Committee of the Board of Education, which committee was responsible for the formulation of the Board plan, testified at the hearing that emotional adjustment, and ability of a child to "adjust to a change in environment" and "different students around him", would be considered, as well as academic achievement. (Tr. p. 47.) And, with respect to each pupil, this arbitrary discretion is to be lodged in three separate persons: teacher, principal, and Superintendent.

The reason for an achievement requirement in the instant situation has not been made clear to me, particularly since it is not imposed upon any other transferees in the system. Indeed, it is quite puzzling in view of the Board's position, strenuously urged throughout the trial, that the Lincoln School is in no way inferior to the other elementary schools in the city; that the quality of education at Lincoln is equal to that provided in the other schools; and that pupil achievement is on a level with that in the other schools. (See also Tr. pp. 143–144.)

It is the Court's conclusion that in the circumstances of this case a requirement with relation to academic achievement and emotional stability cannot and should not be imposed in the granting of transfers. A pupil qualifying for a particular grade in the Lincoln School should

5. Indeed, to term this right to transfer a "privilege" is highly unrealistic. The Board's "achievement" test is premised to an extent on the assumption that it is difficult for young children to adjust to new surroundings. Thus, those who elect to transfer will do so at what may be great personal cost. It may be more difficult for some to adjust than for others. But here constitutional rights are involved, and the decisions as to whether enjoyment of these rights is worth the cost must be made by the individuals affected, and not by the Board.

conclusively be considered eligible for that grade in any of the receiving schools. Of course, once accepted within a receiving school, the transferee should be subject to whatever requirements or classifications are already being applied to all children in that school.

Condition (4) provides that permission to transfer shall be granted only on a year-to-year basis, with priority being given to children actually living within the confines of the receiving school district. I find this provision to be obnoxious, from both an educational and a legal standpoint. Indeed, to expose young children to such uncertainty and insecurity is to make the exercise of their right to transfer from Lincoln so unattractive and onerous that it is questionable whether many would avail themselves of this right. Once again, the Board appears to be proceeding on the fallacious assumption that it is conferring a revocable "privilege" on the Lincoln School children. There is no room in the Constitution for any concept of inferior citizenship. Negroes transferring from Lincoln cannot, consonant with the principle of equal protection of the laws, be subject to a burden which is not borne by others in the receiving schools. Indeed, it is admitted by the Board that continuity of schooling is a vital factor in education. Mr. Romaniello, Mr. Rukeyser, and Dr. Clish all conceded at the hearing that it was unsound and undesirable to disrupt a child's education by shuttling him from school to school, or to keep the child continually in a state of uncertainty with respect to what school he will be attending in any given year.

The Board seeks to justify this provision with the argument that in the event of possible overcrowding, those children actually living within the transferee district should not be required to transfer to other schools. However, the matter of overcrowding of schools is one with which educational authorities constantly must deal; under such circumstances, they have met this responsibility by constructing additional classrooms and new facilities, or by utilizing other resourceful methods. This problem, and the Board's responsibility in relation to it, is in no way altered by the fact that a small percentage of children may be transferees from Lincoln; once these children enter a receiving school they must, out of regard for their constitutional rights, be accorded the same status as children residing within the district. In any event, as I have already indicated, the statistics on vacancies submitted at the hearing indicate that this problem is an extremely remote one. I, therefore, conclude that once a child is transferred to a receiving school, he should be afforded the opportunity to remain in that school until his elementary education has been completed.

Condition (5) requires any parent requesting a transfer to submit a written statement expressing willingness to provide transportation at his own expense. Since the Board presently does not provide public transportation for elementary school children, except in the case of handicapped children, it will not be required to furnish transportation in the case of the Lincoln School children. However, the necessity for a written statement has not been made clear to the Court. Since it does not appear that any other parents in the New Rochelle school system are required to submit such a statement, regardless of the distance traveled between home and school, I do not deem it necessary to require this of the parents of Lincoln School transferees.

Condition (6) reserves to the Board the right of "flexibility" in the administration of the transfer program. But, vague and ambiguous language of this nature is inapposite and indeed dangerous where constitutional rights are being dealt with. It has not been indicated exactly what power the Board is to have under this provision; whatever this power may be, no standards have been included to guide its exercise. The courts have continually reiterated the maxim that constitutional rights cannot

be subject to the exercise of arbitrary discretion. See Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L. Ed. 220. Board of Supervisors of Louisiana State University, etc. v. Ludley, 5 Cir., 252 F.2d 372, certiorari denied, 1958, 358 U.S. 819, 79 S.Ct. 31, 3 L.Ed. 2d 61; Davis v. Schnell, D.C.S.D.Ala., 81 F.Supp. 872, affirmed 1949, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093. In Orleans Parish School Board v. Bush, 5 Cir., 242 F.2d 156, 165, certiorari denied 1957, 354 U.S. 921, 77 S.Ct. 1380, 1 L. Ed.2d 1436, the court held: "Attempts * * * to give any official the power to assign students to schools arbitrarily according to whim or caprice are legally impermissible. * * * "

In the instant case, if, as suggested at the hearing, this provision means merely that the Board may place a transferee within a particular group in a grade on the basis of achievement (i. e., slow, medium or fast learner) after he has been accepted in the receiving school, or that the Board may suggest to the parents of a child seeking transfer that it may be more desirable to transfer to one school rather than another, I know of nothing in the Court's opinion or decree which prevents this. If this is the Board's intention, the provision is unnecessary; if it is intended to mean anything more, it is manifestly improper. In either case, it should not be included.

Finally, condition (7) of the Board's plan requires that all transfer applications be received no later than June 1st of each year, and June 15th of the present year. However, in order to facilitate the parents' election process, and to assure that each child who wishes to transfer will have an opportunity to do so, parents of all children expected to be enrolled in the Lincoln School for the forthcoming year should receive, prior to the date set for application for transfers, information indicating the approximate number of vacancies available for each grade in each of the eleven other elementary schools. In addition, when applying for transfers, each ap-

plicant should have an opportunity to indicate a choice of several schools to which transfer is requested, in preferential order. In order to allow sufficient time for this process, the application deadline this year will be extended to June 30.

### III. Application for Stay

I deem it appropriate to deal at this point with the defendants' request that I stay my final decree pending a determination of the Board's appeal. They base their plea on the contention that plaintiffs will suffer no substantial injury should they be compelled to attend Lincoln Elementary School for another academic year, but that defendants, and the City of New Rochelle, would suffer irreparable damage should they be required to proceed with desegregation this fall. Neither contention is substantiated by the facts.

The determination of whether to grant a stay rests in the Court's discretion and requires a balancing of the equities of the particular situation. It is incumbent upon the defendants to prove that they will be irreparably injured if a stay is not granted. Cf. Eastern Airlines, Inc. v. C. A. B., 2 Cir., 1958, 261 F.2d 830. In this instance, this Court is being asked to weigh the constitutional rights of the plaintiffs against the administrative convenience of the Board of Education and to rule in favor of the latter. Merely to state the proposition is to reject it.

The Board's contention that plaintiffs will not be injured by being required to attend Lincoln School next year completely ignores the findings of the Supreme Court in Brown v. Board of Education, 1954, 347 U.S. 483, 494, 74 S. Ct. 686, 691, 98 L.Ed. 873:

"To separate [children in grade and high schools] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone."

The Court went on to quote with approval the findings of the lower court in the Kansas case:

"Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of [the] law, therefore, has a tendency to [retard] the educational and mental development of negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system." (Brackets in original.)

Thus, each year in attendance at a deliberately segregated school brings further injury to the youngsters affected, and impresses deeper into their consciousness that "feeling of inferiority" the harmful effects of which are immeasurable.

Despite the harm caused by segregated education (and it is noteworthy that during the original trial of the case, even the Board's experts agreed that it is great), the Board now contends that denial of the stay will work more hardship on plaintiffs than would its grant. The Board argues that should it win its appeal, and should it then decide to revoke all transfers for the following year, this would disrupt the education of the children. It is sufficient to state in reply that since it is plaintiffs' constitutional rights which are involved, it is they who should have the right to weigh the risk and decide whether to take advantage of the transfer privilege in the 1961–62 school year. See Dove v. Parham, 8 Cir., 1960, 282 F.2d 256, 258. Moreover, it ill behooves the Board to voice concern over the harmful effects of successive transfers in light of restrictive condition (4) of its proposed plan which envisages similar disruptions.

Clearly then, grant of the stay would work hardship on the plaintiffs. We must balance against this the alleged hardship to defendant Board. Upon so doing, I find that the difficulties envisaged by the Board are not very serious. The Court has adopted the Board's basic proposal of permissive transfers to any school with seats available. Thus, under the Court's decree, there are no new district lines to be drawn and no new facilities to be created, nor will any children attending any of the other elementary schools in New Rochelle be required to transfer elsewhere. The statistics compiled by the Superintendent of Schools indicate that in September, 1961, there will be almost twice as many seats available in existing classes as there are students enrolled in Lincoln School. Thus, regardless of the number of transfer applicants, the Board will be able to place them all without engaging one new teacher or utilizing one additional classroom.[6] To grant a stay in these circumstances would be to ignore completely the realities of the situation.

Several recent decisions of the Supreme Court indicate that the Court now views with disfavor delays in the implementation of desegregation. In Ennis v. Evans, 1960, 364 U.S. 802, 81 S.Ct. 27, 5 L.Ed.2d 36 and Houston Independent School District v. Ross, 1960, 364 U.S. 803, 81 S.Ct. 27, 5 L.Ed.2d 36, the Court denied stays of desegregation plans far more drastic and far reaching than that in the instant case. In Evans, the District Court had approved a plan submitted by the Delaware Board of Education which called for progressive desegregation of the schools, one grade a year, for twelve years. The Court of Appeals reversed and ordered instant total desegregation to begin that coming school year. Despite the fact that the

6. Mr. Rukeyser testified at the hearing that the plan of permissive transfers would not cost the taxpayers any additional money. (Tr. p. 112.)

appellate court had overturned the lower court's finding that the gradual plan proposed was necessary to avoid disruptions of the school system, the Supreme Court denied a stay. In the Houston case, the district court had rejected a plan proposed by the local school authorities and had entered an order embodying its own plan for grade-a-year desegregation to begin that fall. The Court of Appeals affirmed, and stay pending appeal to the Supreme Court was denied by that Court. In Danner v. Holmes, 1960, 364 U.S. 939, 81 S.Ct. 686, the Supreme Court refused to reverse the action of the Chief Judge of the Fifth Circuit who had vacated a stay pending appeal granted by the District Court in a case involving admission of Negro students to the University of Georgia. See also Lucy v. Adams, 1955, 350 U.S. 1, 76 S.Ct. 33, 100 L.Ed. 3.

Seven years have passed since the Supreme Court's historic decision in Brown, and as was stated by the Court in Evans v. Buchanan, D.C.D.Del.1959, 173 F. Supp. 891, 893: "It is time now to get down to the serious business of integration." It is impossible to read extensively the cases in this field without sensing a growing impatience in the courts with proposals that integration plans be subject to any further delays.

In the instant situation, the Board has been considering plans for the desegregation of Lincoln since long prior to 1954, but has continually postponed implementation of any solution to the so-called Lincoln problem. Its request for a stay herein is but another part of this pattern of delay; indeed, the desire to avoid coming to grips with the problem has been manifest throughout these proceedings.

In my opinion of January 24, 1961, I made it clear that desegregation of Lincoln was to begin no later than the start of the 1961–62 school year. The grant of a stay at this juncture undoubtedly would delay desegregation for still another year. Under the circumstances, this would be most inequitable.[7] The application for a stay is denied.

The Court wishes to express its gratitude to the Attorney General for having accepted so promptly the Court's invitation to intervene as amicus curiæ. His position on both the Board's plan and the application for a stay, stated clearly and with candor in his brief, has been of considerable assistance to the Court.

The Court's decree, formulated in accordance with the conclusions set forth above, is appended hereto.

### Decree

■ This action having been tried to the Court without a jury, and the Court having rendered its opinion on January 24, 1961, finding that the Board of Education of the City of New Rochelle had deliberately created and maintained the Lincoln School as a racially segregated school; and the Court having held a hearing on May 10 with respect to the decree to be entered herein; and proposed plans for desegregation having been submitted by the majority and minority members of the Board of Education; and a brief amicus curiæ having been submitted by the Attorney General; and the Court having considered the foregoing, the Court hereby formulates its decree as follows:

It is hereby ordered, adjudged and decreed:

(1) Commencing with the 1961–62 school year, any child of elementary

---

7. Another factor which may be considered in determining whether to grant a stay is the likelihood of success of the appeal. While it would be presumptuous for this Court to evaluate the merit of the Board's appeal, it is noteworthy that the Department of Justice, in its amicus brief, concluded: "This Court made detailed findings of fact which have ample support in the record. In view of the Brown principle that segregated situations such as this should be dealt with under the guidance of the local federal District Court and in view of the eminent reasonableness of the Court's decision in the light of the record it is not likely that defendants would prevail on appeal." (Brief, p. 15.)

school age residing in the Lincoln Elementary School District shall be permitted to register and enroll in any other public elementary school in the New Rochelle Public School System, in accordance with the provisions of this decree.

(2) On or before June 14th of this year (1961) and May 15th of each succeeding year, the Board of Education shall distribute to the parents of all children expected to be enrolled in the Lincoln School for the forthcoming school year transfer application forms which will:

(a) Set forth a list indicating the approximate expected number of vacancies in each grade in each of the other public elementary schools in the city for the forthcoming school year.

(b) Provide an opportunity for the applicant to indicate at least four schools, in preferential order, to which transfer is requested.

(c) Include a notice that parents must provide any necessary transportation at their own expense.

(d) Include a notice that applications for transfer must be received by the official administering the plan no later than June 30th of this year, and June 1st in each succeeding year.

(3) Admission of Lincoln School pupils shall be made only in accordance with the Board's maximum class-size policy, provided that this maximum is not set below its present figure.

(4) The Board is not to impose any standard of academic achievement or emotional adjustment as a requirement for transfers.

(5) Each transferring child shall be assigned to the same grade in the school to which he is transferring as he would have been assigned had he remained at Lincoln.

(6) Each pupil shall be retained in the school to which he has transferred until the completion of his elementary education, unless he becomes a resident of another school district.

(7) The Board is not required to furnish any transportation to pupils transferring in accordance with this decree.

(8) The Court shall retain jurisdiction over this case to assure full compliance with this decree.