**Timothy BRYANT by Glendon Bryant, his parent and next friend et al., Plaintiffs,**

v.

**BOARD OF EDUCATION OF the CITY OF MOUNT VERNON, NEW YORK et al., Defendants.**

**No. 66 Civ. 3277.**

United States District Court
S. D. New York.

Sept. 27, 1967.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants; Simon H. Rifkind, Edward N. Costikyan, Gerald D. Stern, Robert L. Laufer, New York City, of counsel.

Paul B. Zuber, Croton-on-Hudson, N. Y., for plaintiffs.

## OPINION

FREDERICK van PELT BRYAN, District Judge:

Plaintiffs, the parents of Negro school children in the City of Mount Vernon suing on their behalf, seek a decree (1) enjoining defendants the Board of Education and the Superintendent of Schools from maintaining a "neighborhood school policy" pursuant to which it is alleged plaintiffs are assigned to schools on the basis of race; and (2) directing defendants to adopt a plan resulting in the assignment of pupils to a school without regard to their race. This court has jurisdiction under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983. Discovery having been completed, defendants now move for summary judgment pursuant to Rule 56(a), F.R.Civ.P.

The gravamen of the complaint, in the light of the facts elicited during discovery, is that the defendants have utilized the so-called "neighborhood school system" to maintain racially segregated schools in Mount Vernon. Plaintiffs contend that unconstitutional discrimination was practiced in two respects. The first involves the claim that between 1945 and 1955, 49 white pupils were permitted to transfer from what is alleged to have been the predominantly Negro Fulton School, in the area where they resided, to other predominantly white schools.

The second is to the effect that defendants, once in 1945 and again in 1955, "gerrymandered" attendance zone lines for certain schools with the intention of removing white pupils from predominantly Negro schools to predominantly white schools.

### 1. Basic Facts About the City of Mount Vernon.[1]

A full understanding of the questions presented requires an examination of the racial situation in the City of Mount Vernon as it has developed over more than two decades. The City of Mount Vernon, which is co-extensive with the City School District under the Education Law of New York, comprises an area of approximately 4.2 square miles, with a population of over 76,000. The City boundaries define an area which is, roughly square in shape. According to the United States census of 1960, Mount Vernon was the ninth most densely populated community in the entire nation. The City has for many years had a large industrial and commercial area along its western and southern borders, and the heart of the business district is located in the central and southern portions of the City, with the northern and eastern sections comprising the residential areas. An important physical feature of Mount Vernon, from the point of view of its neighborhood school policy, is the presence of the New York, New Haven & Hartford R.R., whose tracks, running east and west, divide the City into two virtually equal sections. As a protection for the children no elementary school attendance zone has ever been extended across the railroad tracks.

At the time of World War II, the population of Mount Vernon was nearly 100% white. The influx of Negroes, primarily from nearby New York City, began slowly after the war so that—and the figures are approximations—the population of Mount Vernon was 10% Negro by 1950. In the following decade the Negro population increased by 91%, while the white population decreased by 5% in the City as a whole. Thus by 1960 Negroes comprised approximately 20% of the City's total population. Since 1960 the Negro population has continued to increase; white population has declined. It is estimated that 30% of the City's present population is Negro, with perhaps as many as 80% of these residents living south of the railroad tracks which bisect the City.

### 2. The Neighborhood School System.

At present the public elementary school system in Mount Vernon—serving more than 6,500 children, ages 5–11, in the kindergarten through sixth grade—consists of eleven schools; each of these is located in one of the eleven attendance zones into which the City has long been divided by the local school authorities.[2] The elementary schools south of the railroad tracks, and the ones with which this case is directly concerned, are Grimes, Hale, Fulton, Graham and Longfellow. The policy of dividing the City into attendance zones, so that children residing in an area are assigned to a school near their homes, was devised and implemented at least as early as 1922, when the present City Charter was adopted. There is no question that this system of school assignment—characterized here as the "neighborhood school policy"—was firmly established in Mount Vernon, as in most communities throughout the State, long before the City witnessed any significant influx of Negro population.

At least as initially adopted, then, Mount Vernon's neighborhood school policy was not a device or scheme for assigning students to schools on the basis of race. On the contrary, the system of assigning children to schools in close proximity to their homes was deemed to have —and still has—a number of advantages in terms of both practical considerations and sound educational policy. The beneficial effects of the neighborhood school

1. See generally Affidavit of deMarinis, President of the Board of Education, Oct. 28, 1966, ¶¶ 13–14.

2. See generally Affidavit of deMarinis ¶¶ 15–17.

—as well as some of the disadvantages— have been well-catalogued elsewhere.[3] It is therefore unnecessary to dwell at great length on the advantages of an educational arrangement that permits small children to attend schools within a safe and convenient distance from their homes; that provides a neighborhood center where the pupils can readily join in after-hours programs and parents can conveniently participate in school affairs; and that at the same time avoids local expenditures for transportation and lunchroom facilities. Indeed, only one of the eleven elementary schools in Mount Vernon presently has facilities for serving food to its attending pupils.

### 3. *Governing Legal Principles.*

■ No extended discussion of the applicable law is necessary. Ever since Brown v. Board of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), it has been settled that the equal protection clause of the Fourteenth Amendment bars school segregation mandated by official racial classification. This cardinal principle has been applied on numerous occasions by courts in every part of the land.[4] It is true that the full reach of the constitutional right to an equal educational opportunity poses difficult problems when segregation results from *de facto* rather than official policies of *de jure* discrimination.[5] But our case is not so difficult. The complaint charges the Mount Vernon School Board with intentional racial discrimination. If established by the proof both the transfer of white children out of Negro school districts, see Goss v. Board of Educ., 373 U. S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963), and the gerrymandering of school attendance zones to perpetuate racial segregation, see Taylor v. Board of Educ., 191 F.Supp. 181 (S.D.N.Y.), modified plan approved, 195 F.Supp. 231, aff'd, 294 F.2d 36 (2d Cir.), cert. den., 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961); Dowell v. School Board, 244 F.Supp. 971 (W.D.Okl.1965), aff'd as modified, 375 F.2d 158 (10th Cir. 1967), would constitute classic violations of the principles enunciated by Brown v. Board of Educ. The only issue on this motion is whether there is sufficient evidence before the court to justify the grant of summary judgment to defendants on the two basically simple claims of purposeful *de jure* segregation.

### 4. *Alleged Improper Permissive Transfers.*

■ The defendants have completely disproved the contention that the Board of Education permitted the transfer of white children to escape predominantly Negro school districts. The facts which defendants adduced bearing on this issue conclusively established that the transfers were not made for any such reasons. Defendants, at least since 1947, when Mount Vernon had virtually no racial imbalance in its elementary schools, have pursued a consistent policy of forbidding transfers except for situations of special hard-

---

3. See Hobson v. Hansen, 269 F.Supp. 401, 409–10, 503–506 (D.D.C.1967); Blocker v. Board of Educ., 226 F.Supp. 208, 223–224 (E.D.N.Y.1964). As to some of the specific disadvantages of the neighborhood school in the Mt. Vernon setting, see "Dodson Report," pp. 14–16, exhibit B, annexed to the affidavit of M. Joseph de Marinis on behalf of defendant.

4. See the cases collected and discussed in the recent comprehensive opinions by Judge Wisdom in United States v. Jefferson County, 372 F.2d 836 (5th Cir. 1966), and Judge Wright in Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.1967).

5. Compare Deal v. Cincinnati Board of Educ., 369 F.2d 55 (6th Cir. 1966), and Gilliam v. School Board, 345 F.2d 325 (4th Cir.), vacated Bradley v. School Board, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965), and Downs v. Board of Educ., 336 F.2d 988 (10th Cir. 1964), cert. den. 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965), and Bell v. School City of Gary, 324 F.2d 209 (7th Cir. 1963), cert. den., 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964), with United States v. Jefferson County, 372 F.2d 836 (5th Cir. 1966), reaffirmed en banc, 380 F.2d 385 (5th Cir. 1967), and Barksdale v. Springfield School Committee, 237 F. Supp. 543 (D.Mass.), vacated, 348 F.2d 261 (1st Cir. 1965), and Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.1967).

ship.[6] Race has not been a consideration of special hardship justifying transfer.[7]

The records of the Board disprove plaintiffs' allegations that 49 white pupils were permitted to transfer improperly. Of the 49 pupils named, seven are Negroes; 47 of the transfers were occasioned by simple changes in residence from one district to another; one retarded student was permitted to attend a special education class in another district; the last student had a serious eye affliction and was given permission to attend the only school with a special sight-saving class.

These facts, set forth in the affidavit of Anthony Zuzolo, head of the Attendance Department of the Mount Vernon public school system, are based on his personal examination of the pupil index cards which are kept at the Education Center in Mount Vernon.[8] The proof presented by defendants to the effect that the motivation for the transfer of the 49 students was entirely proper stands uncontradicted.

There is thus no genuine issue of material fact to be tried with respect to alleged improper transfers and defendants are entitled to summary judgment on that question. Rule 56(e), F.R.C.P.

### 5. Alleged Gerrymandering.

Plaintiffs base their charge of gerrymandering on two redistrictings of the schools south of the railroad tracks. The first, in 1945, affected the Grimes, Hale and Fulton districts. The second, in 1955, involved the same three districts, as well as the Longfellow district. In support of the allegations of the complaint—and in opposition to the present motion—plaintiffs offer nothing more than the census figures for 1940, 1950 and 1960 in and around the affected districts.[9]

At the outset it should be noted that the census figures are not a reliable index on which to ground allegations of gerrymandering. In the first place the 1940 and 1950 census figures show only the number of white and non-white *dwelling units* in a particular area. There will be at best an imprecise correlation between the percentage of white and Negro children attending a particular school and the ratio of white and Negro dwelling units.

6. Affidavit of Ellis, ¶ 55, March 13, 1967.

7. See Goss v. Board of Educ., 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963). The six permissible grounds for transfer are listed in Def.Ex. 10, which is a unanimous resolution of the Board:
"1. Upon the recommendation of the Child Guidance Clinic and the Principal of the School.
2. Upon the recommendation of the Chief Medical Inspector.
3. Pupils in the sixth grade who change their residence during the school year and wish to continue in the original district until promotion to junior high school.
4. Pupils in the ninth grade who change their residence during the school year and wish to continue in the original district until graduation.
5. Pupils in any grade who change their residence during the semester and wish to continue in the original district until the end of the semester.
6. Pupils in any grade who present evidence by lease or purchase of intention to move into a different district *may* be admitted to the school of new district."

8. Mr. Zuzolo states that plaintiffs' attorney was advised of the existence of these index cards and invited to examine them on February 10, 1967, but that the invitation was declined, and this statement has not been challenged. Affidavit of Mr. Anthony Zuzolo, ¶¶ 7 and 8.

9. That the census figures are the only proof upon which plaintiffs presently intend to rely is shown by the deposition of Paul B. Zuber, taken by defendants on Feb. 27, 1967. Mr. Zuber stated that, "judging this purely from looking at the names," he was of the view that all of the 186 students transferred in 1945 were white, but that he had taken "no other" means of verifying his suspicion. Tr. 14–17. Furthermore, when asked by the defendants through interrogatories to state the number of Negro and white pupils, or the percentage of each group in the three affected schools both before and after the 1945 redistricting, it was said only that the examination of defendants' records did not disclose the relevant figures.

There is strong evidence indicating that the Mount Vernon Negro population has a much higher percentage of school-age children than does the white population. Even the 1960 census, which indicates by race the number of children of elementary school age, does not reflect another obviously crucial factor—how many of these children attended public, as opposed to private or parochial, schools. Also detracting from the probative value of the census statistics is the fact that the redrawing of the school zones complained of occurred either five years before or after a census had been taken. This time lapse is significant when it is realized that Mount Vernon experienced very large population shifts between 1940 and the present. Finally—and most important—the census figures, accepted at face value, do not support even plaintiffs' narrowest claims. On the record before me the charges of gerrymandering are shown to be without merit.

### (a) *The 1945 redistricting.*

The following are the facts as to the slight changes in district lines during 1945.

Prior to the alteration of the zone lines the records of the Board show that the facilities of Fulton were overcrowded while the facilities of two neighboring schools, Grimes and Hale, were underutilized.[10] As a result the possibility of a readjustment to rectify the situation was discussed and a proposal adopted at a Board meeting on July 24, 1945.[11] A public hearing was scheduled "for the purpose of informing citizens regarding the proposed changes and providing the opportunity for them to express their respective views."[12] Thirty-one parents, the large majority of them white, attended the hearing.[13] Their protests—which concerned solely the walking distances to the other schools, the possible traffic hazards involved in such travel and the

difficulties anticipated from the pupils' unfamiliarity with new teachers—were fully ventilated at the hearing. The Board's position was presented by its President who laid stress on the "overcrowded conditions" at the Fulton School, and emphasized that the situation would worsen if the proposed changes were not adopted.[14] At any rate after further consideration by the Board of the problems involved the zone changes were finally adopted on August 9, 1945.[15]

The only redistricting change made in 1945 was to move the common eastern boundary line for the underutilized Grimes and Hale schools—a line which was at the time the western boundary for the overcrowded Fulton school—further to the east, so that the Grimes and Hale districts were pro tanto enlarged to the extent the Fulton zone was reduced.[16] The resulting districts were not irregular or arbitrary in shape. In fact, the new boundary was a single straight line running down a major artery of the City.

The racial makeup of the three districts before and after the 1945 redistricting, insofar as it is suggested by plaintiffs' census figures, conclusively disproves the allegations of racial discrimination. In the first place, in 1945 Mount Vernon had not yet experienced a marked increase in its Negro population. Census Tract No. 28, which apparently contained the highest percentage of Negro dwelling units in the City during 1940, was still predominantly white by a ratio of nearly 1.4 to 1. Moreover, the heaviest Negro population was concentrated in the westernmost portions of the Grimes and Hale Districts, so that the racial makeup of these critical areas could scarcely be affected by extending the eastern boundary lines of these attendance zones. Contrary to the plaintiffs' contentions, there does not appear to have been a perceptible movement of Negro families into census tract 31 in the west-

---

10. Affidavit of Arthur H. Ellis, March 13, 1967, ¶ 5.

11. Affidavit of Ellis, ¶ 6 and Ex. 1.

12. Ex. 1.

13. Affidavit of Ellis, ¶ 24.

14. Affidavit of Ellis, ¶ 7 and Ex. 2.

15. Affidavit of Ellis, ¶ 8 & Ex. 3.

16. Affidavit of Ellis, Ex. 4.

ern part of Grimes and Hale and this neighborhood plainly did not "correlat[e] with the area which was removed from the Fulton district and placed in the Grimes district." [17]

The 1940 census figures indicate that tract 31 contained only 24 Negro dwelling units out of a total of 976, and that only one square block in that tract was removed from Fulton to Grimes. A total of 22 students were in the group from Fulton re-assigned to Grimes,[18] and most of these appear to have been white since I read the 1940 census maps as indicating that no more than three Negro dwelling units out of over 100 were affected by the shift from Fulton to Grimes. Thus, after the redistricting, Fulton, if anything, had a slight gain in its Negro percentage—which concededly was quite low, while Grimes remained somewhere around 15% Negro.

The statistics for the Hale district before and after the 1945 redistricting are comparable. The Hale zone was enlarged by 3½ blocks, and Fulton was reduced by the same area. Based on 1940 census figures at the most five Negro dwelling units were included among the almost 400 families affected by the shift; the ultimate result in all likelihood was to improve the racial balance in the Hale district. While the zone had formerly been close to one-third Negro, after the redistricting the figure appears to have been closer to one-quarter.[19]

The 1950 census figures submitted by plaintiffs confirm the legitimacy of the 1945 redistricting. Thus five years after the changes were effected the percentage of Negro families residing in the Grimes district had remained somewhere around 22%; Hale was down to about 35% from a high of 43% prior to the 1945 redistricting; in Fulton the Negro percentage had increased slightly five years after the lines of the zones had been re-

drawn. Plainly the 1945 redistricting did not cause segregation; nor could it have been motivated by a design to establish segregated elementary schools in Mount Vernon. There is no triable issue on this contention.

### (b) *The 1955 redistricting.*

The last changes in school boundaries on which the complaint of gerrymandering is based occurred almost twelve years ago. Once again, these changes, like those in 1945, were not boundary manipulations which, in either design and effect, materially contributed to racial imbalance in Mount Vernon's elementary schools.

According to the uncontradicted minutes of the Board of Education, the 1955 changes were also made "to relieve the crowded conditions" in certain of the public elementary schools, particularly Grimes and Hale, and to take account of the addition to the Fulton School built in 1955 following a fire.[20] Plaintiffs have conceded that they have no evidence indicating that there was not overcrowding and underutilization at the time.[21] To remedy the situation the Board transferred back to Fulton the area it had lost in the 1945 redistricting plus additional blocks from the overcrowded Grimes and Hale districts. The changes effected were not capricious or contrived: six square blocks from the eastern-most border of Grimes were transferred to Fulton; another six square blocks were removed from the eastern-most border of Hale and were placed in Fulton; and two more square blocks, also from Hale's eastern border, were transferred to the Longfellow district which is directly to the south of Hale and Fulton. The boundary changes on their face contain no weird shapes, uneven borders or other features indicative of conscious gerrymandering. The shift was effected by drawing straight lines along major arteries without out the creation of multi-sided zones. As

---

17. Affidavit of Paul B. Zuber, March 22, 1967, p. 2.

18. Affidavit of Ellis, Ex. 1, p. 2.

19. See Affidavit of Laufer, April 6, 1967, ¶ 18.

20. See Affidavit of Ellis, Ex. 5.

21. Deposition of Zuber, pp. 53–54.

in 1945, the 1955 redistricting achieved the desired objective—a redistribution of students to rectify the overcrowded conditions in certain schools.[22]

Plaintiffs' contentions with respect to the 1955 redistricting are narrow. They apparently rely upon the census figures to establish that the changes had an appreciable unfavorable inpact on the racial makeup of the affected schools. In particular, the claim is basically that two areas containing mostly white pupils, one in Hale and one in Fulton, were shifted to Grimes and Longfellow respectively, thereby increasing the Negro percentage in Hale and Fulton.[23]

In fact the alleged shift from Hale to Grimes, attacked as discriminatory, never took place. The area so identified had been a part of the Grimes district even before the 1945 redistricting.[24] The shift to Longfellow, did not, as plaintiffs originally contended, affect territory previously located in Fulton, but rather involved two blocks formerly situated in Hale.[25] In any event the change—which plaintiffs claim involved the "most obvious" instance of gerrymandering in 1955 [26]—was merely an attempt to deal with overcrowding.

It is true that the 1950 census figures submitted by plaintiffs indicate that, insofar as the number of dwelling units is concerned, the effect of the 1955 redistricting was to increase the ratio of Negroes to whites in both the Grimes and Hale schools. In particular, the two blocks which were shifted from Hale to Longfellow contained not a single Negro unit out of a total of 133. Moreover the

two block projection of the Longfellow zone into the Hale district in the 1955 redistricting breaks the otherwise continuous line of the northern Longfellow boundary. Thus plaintiffs have presented enough to require a careful look at this situation. However, upon further scrutiny the census figures, which are the foundation of plaintiffs' claims, are demonstrably insufficient to support an inference—much less to present a triable issue—as to whether the 1955 redistricting was motivated by racial considerations.

In the first place if the two blocks attached to Longfellow, like the other six removed from Hale, had been transferred to Fulton that school would have exceeded its capacity; the only alternative was to place the area in Longfellow which could clearly accommodate the new students.[27] In addition, by all estimates the two block area shifted could not have contained more than a handful of students— perhaps thirty or forty—so that the shift was de minimis whatever its impact.[28]

Furthermore, even when the 1950 census figures are applied [29] to the four schools affected by the 1955 changes, the results are not probative of anything that is central to this lawsuit. Taking first the shift of certain blocks from the Grimes to the Fulton zone we find that the percent of Negro dwelling units in the Grimes district increased from approximately 22% to 24%. The ratio of Negro to white dwelling units in the Fulton zone was cut back by a similar insignificant figure from about 15% to 11%. The addition of two blocks to the Longfellow

22. Affidavit of Ellis, ¶¶ 35–36.

23. Affidavit of Ellis, Ex. 8, marked by Mr. Zuber at his deposition, see p. 23,

24. See Affidavit of Ellis, Ex. 4.

25. After plaintiffs' error in this regard had been shown, plaintiffs then alleged that defendants, through the 1955 zone changes, had attempted to maintain Fulton as a predominantly white school. See affidavit of Zuber, p. 6. This contention also is unsupported. See text and accompanying notes 29, 30, infra. It will be recalled that originally plaintiffs had

contended that the percent of Negro students in Fulton had been enlarged by the 1955 changes.

26. Affidavit of Zuber, p. 3.

27. See Affidavit of Laufer, ¶¶ 48–50.

28. The Hale school had over 900 students and encompassed an area of 25 square blocks before the redistricting.

29. Again, it must be emphasized that at best the census figures provide only a *very* rough estimate of the effects of the zone changes on the racial balance in the elementary schools.

district—the most controversial of the 1955 alterations—was reflected in a very slight decrease in the percent of Negro dwelling units, from just under 9% to just under 8%. These variations are insignificant. If anything, they go towards disproving the allegations that the 1955 redistricting was discriminatory in motive and effect. The only numbers of possible probative value relate to the Hale zone, which according to the 1950 figures increased from close to 35% Negro to 56% Negro after the redistricting.[30] The suggestion of relevance conveyed by this 1950 statistic—as well as by the 1955 transfer of two allegedly all-white blocks from Hale to Longfellow—is undermined by a further analysis of plaintiffs' census figures and of developments in Mount Vernon from 1950 to 1960.

Many factors were at work in Mount Vernon in the decade of the 1950's. The City was experiencing a large influx of Negro population. No doubt social, economic and primarily residential patterns created the difficult problems of racial imbalance which now concern the entire community. For example, census Tracts Nos. 29 and 30, which have been located in Grimes since long before 1940, when combined, were 29% Negro by units in 1950 and 48% Negro in 1960. Census Tract No. 28 which has made up the major portion of the Hale zone since before the 1945 redistricting was 54% Negro in 1950 and 66% Negro in 1960. Tracts 27 and 32, which have comprised the major portion of the Fulton zone since 1940, were 16% Negro in 1950 and 43% Negro in 1960.[31] The two blocks which were removed from Hale to Longfellow in 1955 were located in this area of very large increase in Negro popula-

tion. It is therefore mere speculation to urge, as plaintiffs do on the basis of the 1950 census figures, that the two blocks which were transferred five years later were all white and that in any event the redistricting evidenced a racially motivated attempt to segregate Mount Vernon's elementary schools. On the basis of this evidence the probabilities are that these two blocks—which represent what plaintiffs claim the most obvious example of intentional discrimination—were substantially integrated neighborhoods. These probabilities are supported by sworn statements of responsible and knowledgeable school officials to the effect that the 1955 redistricting had virtually no effect on the racial makeup of the affected schools.[32] There is no evidence to the contrary.

There is also some evidence, which has not been contradicted that between 1949 and 1955 in the absence of zone changes the actual percentage of Negro students in Fulton increased from 5% to 25–30% and between 1952 and June 1954, the Negro percentage in Grimes rose from 25–30% to 40%.[33]

On this record there is nothing before me to require a trial on the issue of gerrymandering. The racial imbalance, concededly present in the Mount Vernon Schools, could only have come about by reason of the movement of Negro population into the affected zones, the movement out of white population and the removal of many of the remaining white children to private and parochial schools.[34]

### 5. The Present Situation

A great deal has happened in Mount Vernon since the 1955 redistricting. By 1963 the Fulton School, allegedly the

---

30. See Affidavit of Laufer, ¶ 28.

31. See Affidavit of Laufer, ¶ 31.

32. Affidavit of Wackermann; Affidavit of Rider; Affidavit of Moccia, March 13, 1967; see Johnson v. Hunger, 266 F. Supp. 590 (S.D.N.Y.1967).

33. Affidavit of Zuzolo ¶¶ 3–4; Affidavit of Rider ¶ 2.

34. Affidavit of de Marinis ¶¶ 25–31; Affidavit of Zuzolo ¶¶ 3–4; Affidavit of Wackermann. Compare Downs v. Board of Educ., 336 F.2d 988, 996–997 (10th Cir. 1964), cert. den., 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965); Bell v. School City of Gary, 324 F.2d 209, 212 (7th Cir. 1963), cert. den., 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964).

"beneficiary" of both the 1945 and 1955 redistrictings, was more than 73% Negro. Longfellow, the recipient of two blocks from Hale in 1955, was almost 60% Negro. Grimes' non-white student population was more than 80% and Hale's more than 95%. The Graham district, the other zone on the south side of town, was 58% Negro. The six remaining school districts on the north side were overwhelmingly white.[35] In fact what occurred in 1945 and 1955 had little, if any, effect on the current situation.

The citizens of Mount Vernon have not been content to tolerate the status quo. The school officials, stimulated by a policy statement issued on June 14, 1963, by the New York State Commissioner of Education, have recently undertaken a comprehensive program to combat racial imbalance in the local schools. The Commissioner's pronouncement quite correctly declared in part that racial imbalance in public schools "interferes with the achievement of equality of educational opportunity," that such imbalance must "be eliminated from the schools of New York State" and that "it is the responsibility of local school authorities in such communities to develop and implement the necessary plans" to accomplish that end.[36] Within a month the Mount Vernon Board adopted a resolution endorsing the policy set forth in the Commissioner's letter.[37] Work was immediately begun to devise a plan for reducing or eliminating, the existing racial imbalance. A 12-member Advisory Committee was formed and the services of the Center for Human Relations and Community Studies of New York University were secured.

In February, 1964, Dr. Dan W. Dodson of the Center for Human Relations submitted a lengthy report to the Advisory Committee and the Board. The "Dodson Report" has been the focal point of much of the recent community dialogue on the question of racial imbalance in Mount Vernon Schools. Among the proposals discussed by Dr. Dodson were open enrollment, special ability schools, a single educational center, a plan to create a single school for all sixth grade children in the city, and lastly, a plan to reorganize completely the elementary school system of Mount Vernon so that the six schools on the City's north side would house all the first through third grade pupils and the five schools on the south side all the fourth through sixth graders. The latter plan, although it contemplated considerable busing of children, was endorsed with some reservations by Dr. Dodson and became known as the "Dodson Plan."

During February and early March 1964 the "Dodson Plan" was attacked with some vehemence by parent groups in Mount Vernon.[38] On March 12, the Mount Vernon Board, by a vote of 7–2, adopted the first of several suggested programs aimed at combatting the local problems of racial imbalance. The primary feature of this program was the adoption of a form of "open enrollment" permitting Negro parents to apply for and obtain, virtually automatically, permission to have their children transferred to a school north of the tracks. The busing proposals envisioned by the "Dodson Plan" were not adopted. A summary of the features of the new program were forwarded to the State Commissioner of Education who responded by commending the Board for the steps taken.[39]

Shortly thereafter, on April 10, 1964, a petition pursuant to Section 310 of the New York State Education Law, McKinney's Consol. Laws, c. 16 was filed with the Commissioner, on behalf of a group of Negro students in Mount Ver-

35. Affidavit of de Marinis, ¶ 28.

36. Def. Ex. C.

37. Affidavit of de Marinis, ¶ 33.

38. Def.Ex.D–H.

39. Def.Ex.M.

non, appealing from the Board's determination to adopt programs other than the "Dodson Plan." The petitioners in this proceeding achieved partial success on December 21, 1965, when the Commissioner ordered that further efforts be made to reduce existing racial imbalance in the City's elementary schools.[40] March 15, 1966 was set as the date for the submission of a further plan.

A comprehensive program was submitted to the Commissioner on March 3, 1966. In broad scope, the new plan consists of certain expansions on the "open enrollment" program, a plan that is virtually identical with the one ordered by this court for the City of New Rochelle in Taylor v. Board of Educ., 195 F.Supp. 231, 240–241 (S.D.N.Y.1961). The defendants assert, and plaintiffs do not deny, that as of the start of the 1966–1967 school year at least three of the plaintiffs in this action are now included in the more than 300 Negro pupils who are enrolled in elementary school on the north side pursuant to the new program.[41]

In addition, the new plan of March 3, 1966, proposes the establishment of a "Children's Academy" for elementary school children throughout the City of Mount Vernon. Pursuant to this proposal the Board intends to erect an elementary school campus where groups of one-third of the pupils from each of the first through sixth grades at each of the City's eleven elementary schools will spend 40% of the time devoted to their elementary education. Since the student body at the Academy will consist of a portion of the pupils from each of the City's elementary schools, it will obviously reflect the racial balance within the City itself. Many details of the Academy plan are still being worked out.

On April 29, 1966, the State Commissioner of Education found the plan submitted by the Board to be satisfactory and praised the proposal as an "imaginative, practical approach" to a "difficult and complex" problem.[42] The Board was directed to furnish progress reports from "time to time" and the Commissioner specifically "retained jurisdiction" in the proceeding,[43] which apparently is still pending.

On October 5, 1966 another administrative proceeding—also still pending—was initiated before the Commissioner to remove the Mount Vernon Board. This action followed six days later.

The plaintiffs, obviously dissatisfied with the efforts of the Board and the results of the administrative proceeding, as a last resort, sought the intervention of a federal court of equity directing defendants to adopt and implement the "Dodson Plan." Yet the "Dodson Plan" which plaintiffs urge upon the court itself is inconsistent with plaintiffs' contentions. Dr. Dodson specifically found that the school system before 1960 had

---

**40.** The order reads in pertinent part:
"While I am not unmindful of the various complexities here existing, I am not satisfied, however, that respondent has exhausted all avenues of approach to a correction of the difficulties existing in this respect, and it will therefore be necessary for respondent to formulate and submit to me a plan for the progressive reduction of the racial imbalance existing in this district to the fullest extent possible within sound educational principles, including the steps to be taken in this direction beginning with the school year 1966–67."

**41.** Affidavit of de Marinis ¶ 51.

**42.** The Commissioner's decision, Def.Ex. Z, reads in part: "The proposed plan, in my opinion, is an imaginative, practical approach to the solution of the difficult and complex problem of eliminating the educational disadvantages of racial imbalance in Mount Vernon. If carried out as scheduled, it would provide a new level of educational excellence in the city beyond and above what is possible at the present time and assure that every child would have integrated experiences.
"Therefore, I have determined to accept the proposed plan as satisfying my Order of December 21, 1965."

**43.** Def.Ex.Z, pp. 3, 4.

**280**

been operated on a "color blind" basis. In particular he concluded that "there can be no complaints of gerrymandering or otherwise discriminating by manipulation of school zones in the elementary grades, since these boundaries, with minor exceptions, have been unaltered for years." [44]

The evidence adduced before this court fully confirms Dr. Dodson's conclusion. The complaints of improper transfers and gerrymandering are without merit. The problems of racial imbalance in Mount Vernon are presently being considered by the State Commissioner of Education and what he characterized as imaginative and far-reaching proposals have been adopted and some of them implemented by the Board.

It has been conclusively established on this record that this is not a case of *de jure* segregation.

There is no doubt that serious problems of racial imbalance do exist in the Mount Vernon elementary schools. However, the neighborhood school policy which plaintiffs claim lies at the root of the problem has been substantially modified by action of the Mount Vernon school officials. Other steps are being taken to overcome racial imbalance and to provide quality education for all without regard to race. These things are being done under the supervision and direction of the State Commissioner of Education in furtherance of his declared policy against segregation in the schools of this state.

Upon the record before me intervention by this court is not justified, nor would such intervention further the solution of these complex and difficult problems which are rightly of such deep concern.

The motion for summary judgment dismissing the complaint is in all respects granted.

It is so ordered.